# ROSWELL HAMILTON v. STATE.

No. A-6348.  Opinion Filed Aug. 27, 1927.
(259  Pac.  168.)

Morgan, Osmond & Morgan and F. E. Sides, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

EDWARDS, J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Hughes county for the crime of murder and his punishment fixed at death.

The record discloses that the defendant is a negro residing at the town of Wetumka. On April 10, 1926, Mitchell Compier, of advanced years, a deputy sheriff, and Weldon Wilson, 22 years old, acting as a night policeman at Wetumka, set out to procure evidence concerning the illicit sale of intoxicating liquor. They drove into the negro section of the town and procured defendant to get them a pint of whisky. He went away and later returned with the whisky and was arrested by the officers, who placed him in a Ford coupe and started to jail, Compier driving and Wilson standing on the running board. It was about 10 o'clock at night, and while

driving along the street defendant shot Wilson, who fell from the running board, and he then shot Compier. Wilson died in about 40 minutes and Compier died instantly. As the car was still moving defendant leaped from it and escaped, but was apprehended about 24 hours later. There was evidence of loud talk in the car just before the shooting. When arrested, defendant admitted the killing and stated that he had lost the pistol, an automatic, with which he did the killing; he had another upon his person when arrested. The pistol belonging to Compier was found on his body and the pistol of Wilson was found at the spot where he fell from the car, each was fully loaded. Wilson made a dying declaration, in substance, that they did not search defendant, as they did not think he was armed. When arrested, defendant had a wound on the arm. He testified that after the officers started to jail with him, Wilson attempted to force him to disclose where he had procured the whisky and beat him over the head with a pistol, and that in doing so the gun discharged, killing Compier and shooting defendant in the arm.

Only three assignments of error are argued. First. That the court erred in denying defendant a change of venue. Second. Error of the court in refusing defendant's requested instructions Nos. 5 and 6. Third. Misconduct of the prosecution in his concluding argument. These assignments will be discussed in the order presented.

Upon the first assignment defendant contends that under the showing made it was an abuse of discretion to deny him a change of venue. The application for change was verified by the affidavit of three citizens of the county setting out that, on account of the bias and prejudice of the inhabitants of the county, defendant could not have a fair trial; that he was a negro and was charged with the killing of Weldon Wilson and Mitchell Com-

pier. That Compier was an Indian peace officer and had been such for many years and was well acquainted throughout the county, and that Wilson was the son of a peace officer, a white man, and who was likewise well acquainted and well liked in the county. That the papers printed in the county had given an inflammatory account of the tragedy, copies of which were attached to the application, and that defendant had been removed from the county and confined in the penitentiary to prevent mob violence. To this showing the state offered 37 affidavits from various citizens of the county, and at the request of defendant various of these affiants were questioned orally, and in qualifying the jurors defendant exercised but 5 of 9 peremptory challenges allowed him by law, evidently being satisfied with the jurors called. The presumption of law is that a defendant can have a fair and impartial trial in the county where the offense was committed, and the burden is on him to show that he cannot have a fair trial in that county. The prosecution fully met and overcame the showing made by defendant. Upon the showing made, we think the trial court properly exercised its discretion, and no error was committed in overruling the application for a change of venue.

Upon the second assignment of error, and requested instructions Nos. 5 and 6 are, in substance, that if the killing was done by defendant in resisting abusive treatment by the officers after his arrest, and in doing so he used no more force than appeared to him necessary for his protection, the jury should acquit. They were given in modified form, and the instructions, as given, as a whole correctly state the issues of law. The defendant excepted to instructions 10 and 11 which cover his theory, assigning the reason that they constitute a comment on the evidence and place the burden of proof on defendant. We think neither ground of these exceptions well found-

ed and that these instructions, taken in connection with the other instructions, are not erroneous.

The final assignment of error, that the argument of the county attorney constitutes an appeal to race prejudice and is prejudicial, is more serious. Our Constitution provides that justice shall be administered without sale, denial, delay, or prejudice. The death penalty, the extreme punishment of the law, should be inflicted only in those cases where the court can say that the trial is free from errors which were calculated to or probably affected the verdict or influenced the jury in assessing the punishment. The defendant is a negro, on trial for killing a white man before a court and jury composed exclusively of white persons.

Several times during the presenting of the evidence, the witnesses referred to defendant as a "nigger," and in an instance or two the county attorney, in propounding questions, referred to him as a "nigger." In the closing argument to the jury, the county attorney said in part:

"* * * You see they have argued a great deal about sympathy. They have argued nothing else to you but maudlin sympathy because he is a black man, they call him to you. They object to him being called a 'nigger.' I don't know why. I just thought that is what he is, a 'nigger' man. * * * That was not in the testimony, and he had no right to mention it because it was not in the testimony, but he testified there, that was later on, that the negro himself stated after he made this statement and they objected to it, he stated he was punching him with a gun and then he shot him. * * * Now, gentlemen of the jury, that is the only question in this case. Is that negro telling you the truth? I want to say to you on the outset right now, and I want you to understand that I am not begging and I am not whining, and I want you to have the nerve of your convictions and don't want you to come in here with any little compromise verdict. If you believe the negro is telling the truth, if you believe he had a right to do it, then have the nerve to turn him

loose because he gives us the truth about it, as that is all the state asks, but if you believe he committed the crime as I say, that is a cold-blooded, double murder up there on the streets of that little town of Wetumka, then from the evidence and the instructions, have the nerve to come in and say he is guilty and give him the penalty that you think will be in conformity with the crime that he committed, and there is no judgment that you can render that would be commensurate with the crime; but, on the other hand, as I stated, you think he did not commit any crime, to make a long story short, it is up to you to have the nerve and courage of your conviction, regardless of what the people of the state, the people of the county, or the people in the courtroom believe, if you believe—if you believed that this negro was innocent, if I believed his statement when I heard it, whether he was telling the truth, so help me God, I wouldn't fear no man, because if I was on the jury and I believed his statements and believed he was telling the truth and believed he killed these officers in self-defense, so help me God, I would turn him loose; but if I believed he was guilty of murder, as I do believe from the testimony in this case that he is, then, gentlemen of the jury, I wouldn't hesitate to pull the lever that took the life of this black boy.

"By Mr. Sides: Now, your honor, we object to the term and appellation 'nigger.'

"By Mr. Fancher: They said he was black. They told me and he told me he was of different blood.

"By the Court: Let the objection be entered, Mr. County Attorney.

"By Mr. Fancher (continuing): They told me he was different blood, different blood runs in his veins, that he was a black man. The gentleman who makes the objection said he wasn't our kind of folks, but when I call him that, however, they don't like it. That is the proposition, gentlemen of the jury. Now, here, let's take this testimony. They don't stay with it. All right, here is the negro said this: That they were coming in a car down there. That he went down and got the whisky and come back, and that they gave him the money, three dollars and a half. He said he took half of that. He is

the only man says that. The only one that went down there with the officers and got that whisky for them. They say these officers ought not to use any deceit. I don't care how you feel about it. They were trying to catch these 'nigger' bootleggers, and I think they had a right to do that. They are trying to enforce the laws of your county while you are asleep. They are trying to keep your county safe and secure for you and for your families and your babies. * * * They make no effort to show how he could have done that. That man already dead in his tracks, yet they want you to say that poor old Mitch, sitting there under that wheel hunkered down with two shots through him, was making an effort to shoot this 'nigger' when he shot back in the car. Now if you believe that, I can't help it. * * * If he had had an opportunity, if he had give him the least show in the world, there would have been a dead 'nigger' out there in that car instead of a dead deputy sheriff.

"By Mr. Sides: We renew our objection to the term 'nigger' used by the county attorney in the argument.

"By the Court: All right.

"By Mr. Fancher (continuing): Gentlemen of the jury, if it is against the law in this country to say 'nigger,' I don't know it. I don't know why. I know I am talking about just what he is. He is a negro man, * * * and then they talk about his rights, and that you must not take his life. No, sir; it is all right for him to kill white men; yes, kill all you want to, but you must be awful careful and not kill him. * * * May I ask you to think of that young man that lies in his grave with his head shot off, and that Mitchell Compier lies out here in this lonely Indian graveyard with two bullet holes through his brain at the hands of this black man.

"By Mr. Sides: Your honor, please, we again renew our objection. The witness' name is Roswell Hamilton, and he is also known as the defendant, and, your honor, I think same is unwarranted.

"By the Court: What do you want me to do?

"By Mr. Sides: I want the—I want you to admonish the county attorney or overrule my objection.

"By the Court: The objection will be overruled.

"By Mr. Sides: Give me an exception.

"By Mr. Fancher: Gentlemen of the jury, look at him and see whether he is black.

"By Mr. Sides: I again renew the objection.

"By the Court: All right, the defendant will be given an exception.

"* * * Now, which are you going to believe? If that doesn't convince your mind that that boy when you remember that he was just marking time to meet his Maker, when he knew that in a very short time that he had to meet him, he said, 'We didn't search him,' and I believe every word that he uttered, and I believe you gentlemen believe it, too, and then have the bold courage to stand up before an intelligent jury and say that you ought to believe this negro in preference to the boy on his deathbed, I say, gentlemen of the jury, before I would say that I want God-o-Mighty to strike me from this earth, in the presence of his mother, tell her that that dying boy lied about it. Would you do it? I wouldn't do it for anything in this world, for all the money that you could get from the negroes of this county; no, I wouldn't. I would believe that boy. I would not go tell a story about it and forget that good boy. Now I say that you ought to be convinced beyond a reasonable doubt that would convince any white man beyond a reasonable doubt. * * * He wants to put that negro man up against Roy Reed. * * * But, gentlemen of the jury, if you believe beyond a reasonable doubt from this testimony that this 'nigger' is guilty of this abominable crime, then have the nerve to say so and come in like cool, calm men with a verdict and say that he should die. * *.*"

That the foregoing excerpts from the argument of the county attorney are an appeal to race prejudice is plain. Cases where appeals of this kind have had the attention of the courts are numerous both in civil and in criminal cases. Where the language is of such character, that it is calculated to influence the verdict, it is generally said that the injury done by such remarks can-

not be atoned by the retraction of the argument or by its disapproval by the trial judge, neither of which was done in this case. All persons accused of crime, whatever their race, color, or condition, should stand on exactly the same footing in a court of justice. It is the duty of the court to see that a defendant is tried according to the law and the evidence, free from any appeal to race prejudice. Particularly is this true where a negro charged with an offense against a white man is tried before a white court and an exclusively white jury, and where the death sentence, the extreme penalty known to the law, may be imposed. In Harris v. State, 96 Miss. 379, 50 So. 626, Whitfield, Chief Justice, in reversing the case, said:

"* * * It certainly needs no argument to show that these remarks of the district attorney, the representative of the state, in his closing argument to the jury, were a direct appeal to race prejudice. * * * Every defendant at the bar of his country, white or black, must be accorded a fair trial according to the law of the land, and that law knows no color. * * *"

See, also, Collins v. State, 100 Miss. 435, 56 So. 527; Tannehill v. State, 159 Ala. 51, 48 So. 662; James v. State, 170 Ala. 72, 54 So. 494; Taylor v. State, 50 Tex. Cr. R. 560, 100 S. W. 393.

In the case of State v. Lee, 130 La. 477, 58 So. 155, in syllabus 6, it is held:

"On the trial of a negro for murder, the district attorney, in argument, stated 'that the brother of deceased, a white man, was present at the trial, had come from the state of Alabama, was from a good family, and his people expected a verdict at the hands of the jury; that if the jury were not to convict this man it will be giving a license to every negro to kill any white man on any pretext, and without excuse'—and the trial court gave no reprimand or caution or instruction to disregard the expressions of the district attorney; the trial court stating that the brother of deceased had testified as to the pur-

pose of his presence, without objection by the defense, and that the district attorney stopped as soon as objection was made. Held, that the district attorney's language was an appeal to race prejudice, and reversible error."

The same court in the case of State v. Bessa, 115 La. 259, 38 So. 985, said:

"* * * Why did the district attorney bring up the matter of blood, if not to draw the color line? Here was a jury all white, and two negroes being tried for striking a white man and nearly killing him. The court thinks it knows enough of the situation between the whites and negroes in Louisiana to know that the average white man is prone enough to be prejudiced in such a case, without being exhorted thereto by the law officer of the government, and that, such an appeal having been once made, the effects thereof cannot be counteracted by any mere cautionary words of sober reason that may be uttered by the judge."

In the early case of Vickers v. United States, 1 Okla. Cr. 452, 98 P. 467, it was said:

"Where the Assistant United States Attorney, in his argument to the jury, went outside of the record and appealed to the passions and prejudices of the jury, and objection was made and overruled, the strength of the testimony against the defendant will be considered, and if the improper statements may have determined the verdict, a new trial will be granted."

And further:

"A public prosecutor is presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action, to become a heated partisan, and appeals to prejudice, he ceases to properly represent the public interest. * * * The only way to secure fair and impartial trials is to set aside the verdicts so procured. * * *"

In the case of Morehead v. State, 12 Okla. Cr. 62, 151 P. 1183, it was held:

"On the trial of a negro charged with the murder

of a white man, before a jury of white men, the county attorney in his opening argument referred to the defendant as 'This black murderer.' On objection being made the court admonished counsel to be temperate in his remarks. The county attorney in his closing argument referred to the defendant as 'This coal black murderer.' Again, objection being made, the court peremptorily overruled the same. The language objected to, held to be grossly improper, and prejudicial to the defendant; and the refusal of the court to interfere and to properly instruct the jury to disregard the same, prejudicial error."

Having reached the conclusion that the argument was prejudicial as constituting an appeal to race prejudice, it follows that the case should be reversed and remanded for a new trial, and that the warden of the penitentiary, upon proper demand, shall deliver the body of defendant to the sheriff of Hughes county to be transported for trial to said Hughes county.

DOYLE, P. J., and DAVENPORT, J., concur.