CLYDE HOLFORD v. STATE.

No. A-8877. Aug. 30, 1935.
(48 Pac. [2d] 1082.)

▆▆▆▆▆▆▆▆▆▆▆▆▆

J. M. Roberts, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, P. J. The plaintiff in error, hereinafter called the defendant, was by information jointly charged, with John Williams and Howard Porter, with the crime of murder; was tried separately, convicted of murder, and sentenced to suffer death by electrocution.

The defendant was an inmate at the state penitentiary, at McAlester, at the time of the alleged killing, serving his second term; was 22 years of age.

The first witness called by the state stated his name was Jean Jordan:

"I was an inmate of the penitentiary on October 28, 1933, serving a term of 35 years for robbery with firearms; I was employed in the store room; on the date of the difficulty Billy Wilson, Lee De Lano and I were in the basement of the laundry about the noon hour; Billy Wilson worked in the laundry; Lee De Lano was a mechanic in the factory; while we were in the basement John Williams, Howard Porter and Clyde Holford, the defendant in this case, came into the room; Williams and Porter had knives and started toward De Lano, who picked up a stool and threw it at them, and picked up another and held it before him as he ran down the aisle of the cage in the laundry; Howard Porter threw an iron at De Lano; De Lano had a knife open in his hand before the boys came in but I do not know if he had the knife after they came in; Clyde Holford, the defendant, did not say a word at the time, and if he had a knife I did not see it; all I saw Holford do was to come in with the other two. Emanuel Trammell was in there when the difficulty started but I did not see him any time during the fight."

Emanuel Trammell, testifying for the state, in substance stated:

"I was an inmate on October 28, 1933, serving time for robbery with fire arms; I recall the incident in which De Lano was killed; my attention was attracted to the difficulty when De Lano threw the stool; I saw Clyde Holford and John Williams there, but the others I did not get a good glimpse of; I saw the boys kill De Lano, two of them struck De Lano with knives and John Williams struck him with an iron; Clyde Holford had a knife but I did not know whether the deceased had a knife or not; after the deceased had been knocked down on the bed, the defendant in this case, Clyde Holford, pushed the deceased in the face with his crutch."

Lige Hoffman, the undertaker, testified as to the location of the wounds, describing the cuts both in the chest and back, and stated that the deceased had a lick in the head.

Eddie Pace testified he saw the defendant and John Williams leaving the basement.

T. E. Hawks testified as follows:

"I was an inmate of the state penitentiary on October 28, 1933, serving time for burglary; I remember the occurrence of the stabbing of Lee De Lano; I had gone down on the elevator and walked back toward where the difficulty occurred; the first I saw or knew about the difficulty was when I saw Howard Porter enter where De Lano was eating dinner; he pulled a knife and started cutting him and a fight began; at this time John Williams entered; he had a knife; I did not see the defendant Holford do anything; John Williams picked up an iron and hit the deceased; all during the fight Clyde Holford stood in the doorway; Lee De Lano picked up a stool and threw it at Howard Porter, and John Williams then stabbed him in the back; De Lano ran to the back and Porter and Williams followed cutting at him. The defendant later followed Porter and Williams to the back and after the deceased was lying on his back on the floor Holford struck the deceased on the head with an iron."

Several questions were asked if he had not changed his testimony as to what he had testified in the preliminary, and the facts developed that since his testimony at the preliminary he had been made a trusty.

The state introduced testimony showing the kind of irons used in the laundry, showing an iron having blood or brain stains on it, which appeared to be hair, blood, and brain stains.

A cord similar to the one attached to the iron was also introduced in evidence. The warden and other witnesses were called and described how the cage in the laundry is inclosed and the method of entering the same. All of the witnesses called to show what took place at the time De Lano was killed were inmates serving a term for different crimes. The killing of De Lano is admitted.

The defendant in this case denied he took any part in it, and testified in substance as follows:

"I am the defendant in this case; I knew the deceased, Lee De Lano, during his lifetime only when I saw him; on October 28, 1933, I went to the laundry to see him and get a shot of morphine a moment before the whistle blew, which was around 11:20; the reason I went to De Lano for morphine I knew where I could locate him, and I knew he had it for sale; I had bought it from him before, that is what I went down for, is to get the morphine; I went into the laundry and got the morphine and stepped back into a cage to cook it up; while I was in there cooking it up the ruckus started in the back end and I came on out; as I came out Jean Jordan met me at the stairs; Jean had a bar or pipe and tried to hit me with it, and Williams came along and I walked on out. By cooking it up I mean I was preparing it to inject, you have to dissolve it before you use it; when the ruckus started everybody was trying to get out of the laundry cage, and I thought something was wrong, and I thought I had better get out as I did not be-

long there, and I did not want to be caught there. I saw no part of the difficulty, nor did I take any part in it; I did not stab Lee De Lano, nor did I hit him with the iron. I never touched him or molested him in any way; that day before the difficulty I laid in that morning; by laying in, I mean I stayed in the cell that morning. They usually release us from the cell around 11:15; at this time I did not cell with either Howard Porter or John Williams; I saw John Williams when he came up behind me in the laundry, that is the only time I saw either one of them until I got on the yard; I came up out of the laundry, went through to the yard and stayed there until in the evening when they came and got me, and charged me with the crime; I learned Lee De Lano had been killed about a half hour after I came out of the laundry; I was in the yard when I found it out. When I met Jean Jordan on the stairway I defended myself with my crutch, I just held the crutch out to keep him from getting to me with this bar; Jean Jordan was back with Lee De Lano when I went back in the cage but I never spoke to him; there was no words passed except I just paid for the stuff and walked out. Jean Jordan and Lee De Lano was back in the cage; I got the stuff from Lee and stepped up to the first cage; I was preparing it when I heard the commotion; I did not see anyone cutting De Lano; I could not see the other cage from where I was. I deny I was standing there and watching the fight; I knew nothing about it and had nothing to do with it."

The defendant, on cross-examination, stated he had been convicted of the larceny of an automobile, and of robbery with firearms; that he was twenty-two years of age, he stated he believed he had lost his six months' good time for hijacking, and that hijacking in the penitentiary meant the same as it did on the outside, that is, taking a fellow's belongings by force.

"I was in no way whatever involved in the difficulty. Prior to the killing of De Lano I did not know John Williams personally; I had known Howard Porter twenty or

thirty days; I do not think he had been in very long; I do not know Lee De Lano, just knew him when I saw him; I had seen him ever since I had been in the penitentiary. I only took morphine when I could get it; I am not an addict; so long as I had any money I would usually find where it could be bought. I had not worked in the laundry; I did not see Howard Porter in the laundry; I saw Jean Jordan; I don't remember seeing Billy Wilson. When I approached Lee De Lano, Jean Jordan and Lee were together in the back cage, in the first compartment; I did not see John Williams when I first went in; I saw him when I came out; I came into the laundry by the rear door and went out up the stairway; I tried to get out at the door closest to me; I would have to walk clear around the cage to get out of the door I came in; John Williams had a knife when he came up behind me; that was the only knife I saw. I paid for the morphine I got with a canteen book. Yes, I met you in the warden's office the afternoon of the stabbing; I refused to say whether I was in the laundry that day; I went out on the yard between the cell house and poker yard; they came out I judge about three o'clock and got me; I knew no reason why they should come and get me; when they took me down John Williams was down in the hole; they got Howard Porter the same time they got me; a runner came by hollowing our names and we both got up and answered the call practically at the same time. Yes, I met Jean Jordan as I was going out of the laundry room and he struck at me with an iron bar, he only glanced me once; he made several attempts to hit me and I grabbed hold of my crutch so he could not close in on me; I had never had a word with Jean Jordan; Williams came up behind me while I was having this trouble with Jordan; when Jordan saw Williams he backed off and I walked out; I don't know what Jordan did after that. The only time now I am allowed a crutch is when I am brought over here, or by myself. I have had a crutch all the time until recently but in recent months I have not been allowed a crutch at all."

Jess Cunningham, testifying in behalf of the defendant, stated:

"I am an inmate of the penitentiary at McAlester, doing time for murder. I knew Edward De Lano in the penitentiary; I have seen Clyde Holford; I was present on the 28th day of October, 1933, when De Lano was killed; loud talking attracted my attention, and I noticed De Lano with a knife in his hand, and heard De Lano say to big John Williams, you are going to pay me or else. Williams told De Lano to give me an even break, that he did not have a knife, and he said, no, I have got you where I want you, and he struck at Williams; Williams stepped back and grabbed a stool and struck back and knocked the knife out of De Lano's hand, and De Lano reached over on the table and got a smoothing iron and they began to fight. There were several there when Williams and De Lano began fighting; I did not see the defendant take any part in the fight; I was in the basement taking a bath when the fight started; the parties were west of me and I did not see them until I heard the noise; I did not see the defendant Holford there at all."

On cross-examination the witness stated:

"I knew De Lano was talking to Williams; he had a knife drawn and was looking right at John; when John picked up the stool and swung it at De Lano, I don't know what De Lano did, I did not see the knife; I left right after De Lano got the smoothing iron; I do not know what became of the knife."

W. J. Miller, testifying in behalf of the defendant, stated:

"I am an inmate of the state penitentiary doing time for bank robbery; was in the penitentiary October 28, 1933; I work in the brick yard and was in the basement of the laundry taking a bath at the time Edward De Lano lost his life; loud talking attracted my attention, then I saw De Lano jerk out a knife and make a run at Johnnie; Johnnie took up a stool and struck at him; they kept strik-

ing at one another and I left right away. I did not see the defendant, Clyde Holford, there at the time; when I left I did not see Howard Porter or the defendant Clyde Holford there at the time; the first move I saw Lee De Lano started to run toward John Williams; Williams was standing near the table, and I believe it was the first one. Jess Cunningham was taking a bath; I don't know which one left first, whether Jess left first or I left first. Jess Cunningham was recalled to identify the iron."

Grady Mickle, testifying for the defendant, stated:

"I am an inmate of the state penitentiary; was working in the prison pants factory, October 28, 1933; I slipped out of the pants factory about 11:30 to go take a bath; there were seven or eight in the bunch; when I went down there was a bunch from the brick yard coming in, and there was one boy, De Lano and a bunch behind the screen net; there was also one boy by the name of John Williams; when I went in De Lano jumped up and pulled a knife and told Williams, here is where he paid a debt, one way or the other; Williams told him he did not have any money or a knife but if he would wait until he got a knife I will pay you; De Lano said that is just where I want you; he struck at Williams and Williams grabbed the stool and swung it and knocked the knife out of his hand; De Lano ran toward the back and picked up an iron; Williams grabbed the knife; I cannot say just what happened right then, they were crowding around, and I turned and walked out; when I first saw De Lano with the knife he was trying to get to this boy Williams; Williams is here in the courtroom; I saw Williams strike at De Lano with a knife; De Lano had a knife when Williams struck at him and knocked it out of his hand; then Williams grabbed the knife and De Lano grabbed an iron; I could not tell what it was, it was standing or setting under or on the table when De Lano grabbed it; there were several boys in there, I did not know all of them; I did not see the defendant Clyde Holford take any part in the difficulty; I saw Howard Porter; I had gone down to take a bath but I had not yet taken it. I am 26 years of age; I am serving a term

for robbery with firearms; I have been in the penitentiary before for burglary; I have been convicted of felony three times; I can't say whether Jess Cunningham was there at the time or not; in '34, first month, and twenty-third day, I was reduced to third class for stealing pants from the Seminole Pants Factory."

Otho Key, testifying for the defendant, stated:

"I am an inmate of the penitentiary serving a term of twenty-five years for robbery with fire arms; I had a conversation with Edward De Lano, October 28, 1933; he tried to borrow a knife from me, and said some boys had double crossed him about some money for morphine, and he was going to get the money or kill them; I told him not to do that; I think he said a boy called Big John; I knew him when I saw him; I have seen a man called Big John here in the courtroom today; when I saw De Lano in the laundry he was back behind where they keep their clothing; when the gang went in to take a bath he came out from behind the cage with a knife in his hand; this boy picked up a stool and threw it at him, and I went back up in front of the cage; I did not see the knife after John Williams threw the stool at De Lano; I turned around and went up to the office where Emanuel Trammel and a boy called Red Bird was sitting in the office eating dinner."

The defendant's witnesses speak of Edward De Lano and Lee De Lano, which, as shown by the testimony, is one and the same party. Several of the witnesses testifying for the defendant claim the defendant took no part in the difficulty but was present in the room when the difficulty started. The defendant denied he took any part in it. Some of the witnesses testifying for the state say the defendant pushed the deceased in the face with his crutch after he was down on the floor, and some of them say he struck him in the head with an iron.

All of the witnesses testifying are convicts in the penitentiary serving from one to three or more terms. The

testimony is conflicting. To harmonize the same, if possible, was a question for the jury. The state's witnesses claim Howard Porter, John Williams, and the defendant came down together to the laundry cage where De Lano and some one else was eating lunch, and it is apparent from the testimony, notwithstandng the conflict, that the defendant came into the laundry with Williams and Porter.

Eight errors are assigned by the defendant as grounds for reversal of this case. The first error assigned is error of the court in overruling the defendant's demurrer to the information. An examination of the demurrer shows that the information in clear and concise language states facts sufficient to advise the defendant of the charge against him. The demurrer to the information was properly overruled.

The eighth assignment is that the court erred in overruling defendant's motion for a new trial. This assignment covers the remaining assignments of error. After a careful examination of the instructions of the court, we hold that the instructions of the court taken in their entirety correctly advised the jury as to the law applicable to the facts, and that the defendant was accorded a fair and impartial trial. The other errors complained of are without merit.

The defendant argues that the verdict of the jury is not supported by the evidence and is contrary to the law. With this contention we cannot agree. The testimony conclusively shows the defendant present with John Williams and Howard Porter at the time the assault was made on the deceased by Williams. There is a conflict in the testimony as to whether or not he took any part in the fight. If the jury believed the evidence on the part of the state, it was sufficient to sustain the verdict as returned by the

jury. On the other hand, if it believed the testimony of the defendant, the defendant should have been acquitted. Evidently from the verdict returned the jury did not believe that defendant's witnesses were testifying to the truth, and by its verdict harmonized the conflict in the testimony and decided against the defendant and returned its verdict of guilty of murder, imposing the death penalty.

This court has many times held that where there is competent evidence which reasonably sustains the verdict and judgment, a conviction will not be reversed although the evidence may be conflicting or different inferences may be drawn from it. Choate v. State, 37 Okla. Cr. 314, 258 Pac. 360; Mayse v. State, 38 Okla. Cr. 144, 259 Pac. 277; Johnson v. State, 57 Okla. Cr. 239, 47 Pac. (2d) 605.

Section 3062, O. S. 1931, in part provides, that:

"On the trial of an indictment or information, questions of law are to be decided by the court, and the questions of fact to be decided by the jury." Calvert v. State, 10 Okla. Cr. 185, 135 Pac. 737; Piazzi v. State, 13 Okla. Cr. 60, 161 Pac. 1176; 17 C. J. 267.

A conviction will not be set aside where there is some substantial evidence to support the verdict. Tillery v. State, 23 Okla. Cr. 226, 214 Pac. 198.

"Where the state's evidence is sufficient * * * the judgment [on conflicting evidence] will not be reversed." Taylor v. State, 21 Okla. Cr. 351, 207 Pac. 746.

After a careful study of the record, we hold that the facts are sufficient to sustain a conviction, but the facts and circumstances in the record are such that the extreme penalty of death by electrocution should not be imposed. Under the provisions of section 3204, O. S. 1931, this court has power to modify the judgment appealed from. We believe that the ends of justice will be met by a modification

442

of the judgment from death by electrocution, to life imprisonment in the state penitentiary, and the judgment is modified to life imprisonment in the state penitentiary, and as modified is affirmed.

EDWARDS and DOYLE, JJ., concur.