## JIM HAITHCOCK v. STATE.

No. A-9279. Dec. 17, 1937.

(74 P. 2d 641.)

Toby Morris and Walter Hubbell, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, P. J.  The plaintiff in error, Jim Haithcock, defendant in the trial court, was by information charged with the murder of Mrs. A. L. Jackson, on the 13th day of November, 1935, near the city of Walters, in Cotton county, Okla., by recklessly driving a Ford truck while under the influence of intoxicating liquor; was tried, convicted of manslaughter in the first degree, and sentenced to serve eight years in the state penitentiary.  To reverse the judgment of the trial court Jim Haithcock preserved his record and has appealed to this court.

The substance of the testimony is that on November 13, 1935, about 9 o'clock a. m., the defendant left Walters, Okla., driving a Ford V8 truck, making deliveries and sales at Rush Springs, Marlow, Duncan, and Comanche, Okla.  Between 11 o'clock a. m., and 6 p. m., the record

shows the defendant drank the contents of six or seven bottles of 3.2 beer; about 6 o'clock p. m., the defendant reached Comanche, and talked to Bob Patty about the collection of a bill in which Mr. Patty was interested; leaving there the record shows the defendant drove to Corum, a distance of about 8 miles, where he had a conversation with C. W. Wilson and Carl Wilson, father and son, serviced his truck at the Wilson station, and defendant traveled west toward Walters, where the accident occurred about ten miles west of Corum and about two miles east of Walters. He collided with a Ford V8 five-passenger touring car driven by a Mr. Caldwell; at the time of the collision the touring car was occupied by seven persons, two suitcases and a pair of crutches; that as a result of the collision Mrs. Jackson and the driver of the car died.

The proof further shows that the scene of the accident was about the center of an S curve on highway 70; this highway is paved, the slab being about 19 feet wide, and has a guard post every eight or ten feet sunken in the earth about four feet, and extending about four feet out of the ground, and threaded with two heavy cable wires, the fence being situated about 5½ feet from the paving on either side of the slab. After the collision the car and truck stopped about 45 feet apart, the car was on the extreme south side of the highway, facing in an eastern direction with three wheels off the concrete. The truck was lying on its side on the extreme north side of the concrete having turned about where it struck the post in the guard fence on the north side of the highway. The post was knocked loose leaving an indenture near the top and a smear of yellow paint; the truck was painted yellow.

It is further shown that the truck was loaded with cases of beer and empty cases, which were thrown into

the bar ditch. The left wheel of the truck was completely turn off by the impact.

The state insists that the defendant was drunk at the time of the collision, but only seeks to prove that his drunkenness was caused from beer. The first witness testifying for the state was Henderson Harris, who states at 12 o'clock noon, before the collision in the evening, the defendant was at the Elks Club in Duncan, and drank the contents of a 12-ounce bottle of beer. Ed Cheves, a resident of Duncan, saw the defendant at his place of business, where the defendant drank the contents of a 12-ounce bottle of 3.2 beer about 4 or 5 o'clock in the afternoon.

Mr. A. C. Atterberry, a witness for the state, stated:

"I work at the Brown Derby, in Duncan, which was at the time known as the Silvermoon Recreation Parlor; the defendant was at this place of business and drank the contents of a 12 ounce bottle of beer between four and five o'clock in the afternoon."

Clyde Stanley also testified he saw the defendant drink a bottle of Schlitz beer about 5 o'clock in the afternoon prior to the accident. On cross-examination Stanley stated as far as he could tell the defendant was sober; he could not say he was under the influence of intoxicating liquor. The defendant came to his place of business to try to sell him some beer, the defendant being a driver for a wholesale company that was selling beer in that locality.

Helen Sutherland stated she worked at a place about six miles south of Duncan, between Duncan and Comanche, on the highway; defendant was at their place of business between 4 and 5 o'clock; she sold him a sandwich and beer, that the defendant drank the contents of a bottle of Old Style Lager beer; she remembered the kind because he called for Waldorf and she did not have it. A Mr.

Ferguson was there in the place and was discussing the accident Mark Izzard had, and the defendant spoke up and said he was 100 per cent. for Izzard. Witness then admitted she had previously known Mrs. Jackson who was killed in the wreck but had not seen her for many years. Being further examined by counsel for the defendant the witness stated it was the manner in which the defendant said things that caused her to believe he was under the influence of intoxicating liquor; that he was butting into other people's conversation and kept repeating things.

Paul Mason, testifying for the state, testified:

"I live at Comanche; on the 13th day of November, 1935, I was working at the Prince Cafe; the defendant was in the cafe and drank a can of Old Style Lager beer, and he appeared to be under the influence of intoxicating liquor; he was very talkative, his eyes were red, and he staggered when he started to leave the cafe." On cross-examination witness stated he did not talk to the defendant, just saw him.

C. W. Wilson testified he lived at Corum, Okla., and was operating a store on November 13, 1935:

"The defendant was at my place of business the day the accident occurred. I saw him about seven or eight o'clock in the evening; defendant stopped his truck at my place and I had a conversation with him over the question as to whether or not the defendant was able to drive his truck; he had his truck serviced and I believe had his oil changed. In reply to my question, 'Are you able to go ahead?' he laughed and stated, 'Why of course I can.'"

Witness said he thought the defendant was intoxicated was why he asked him.

"The defendant talked loud, I did not smell anything on the defendant. I do not believe the defendant staggered." He was talkative but was always talking in his

place of business. On cross-examination witness stated the defendant was intoxicated to some extent; that he thought the defendant was under the influence of intoxicating liquor, but he drove away in the proper manner.

Art L. Jackson, testifying for the state, stated:

"I was in Cotton County on November 13, 1935; I had been to Davidson, my wife was with me; we left Davidson coming this way about 4:35 in the afternoon; in the car with me was John Caldwell, my brother-in-law; Douglas and Kenneth Simmons, my wife, Pearl Caldwell, and Albert Caldwell, and Grandma Simmons; seven of us in the car; we were driving a Ford V8, two door sedan; John Caldwell was driving about 35 miles an hour; John Caldwell was my wife's brother; when he left Davidson we started to Shawnee, my home; we expected to stop at Grandma Simmons' at Comanche; we came through Walters around seven o'clock and drove out on Highway No. 70; I don't think we went over 35 miles from Davidson to Walters; Mr. Simmons and his wife had been in a wreck just three weeks before and he had his crutches with him, and every time we went over a rough place he would hollow and say, 'Oh!' and we were not driving fast on that account.

"Mr. Simmons was in the front seat on the right hand side, the little Simmons boy was in the middle, and John Caldwell was driving. In the back seat of the car was my wife, I was next to her, and Mrs. Simmons on the right of me, with the little boy Albert sitting on my lap; he was four years old; the boy in the front was about 12. Just as we were on the bridge or just off it I noticed car lights; I did not pay much attention except I could see the lights coming from the east on the curve of the next bridge; I could not tell how far it was up there; there is a little curve and then the road straightens out, and just as that straightened out the truck hit us.

"Whenever I noticed him he was in the middle of the road; just before the truck hit us, our car pulled to the right and I felt our right wheels leave the edge of the

pavement and hit the shoulder; there were posts on that pavement I judge about six feet, the truck looked like it was in the center of the road and our driver was trying to dodge him just before the collision. There were two killed, my wife and my brother-in-law; there were five others hurt in the collision; we were all taken to the Thompson hospital. I crawled out through a torn place in the car and pulled my wife out and laid her on the ground, and saw the bulk of a man standing away from the truck—looked to be about 10 or 15 feet—just as I saw him he started to move and I hollowed at him to stop, told him he had killed all my family; he stopped and I walked up toward him, did not get very close to him; I took my wife's head in my arm, and he was going up the road again and I hollowed, 'Please do not run off, I have to have some help,' I said, 'What is the matter with you,' and he said, 'There is nothing the matter with me.' There was a car coming from the east and I flagged it, and while I was doing that he disappeared. My wife died from the injuries received in this accident.

"After the accident our car was still on the right side of the road, with two hind wheels still off the pavement, and the truck was turned over on its side on the north side of the road, and turned back east. I cannot tell definitely how far the truck was from the car when they stopped; it looked like two lengths of the truck; I flagged the first car coming from the west, I did not know who they were, the first car turned around and came back and called an ambulance and I got help after that. I stayed in the hospital seven or eight days."

On cross-examination witness stated:

"It did not seem to me like Mr. Caldwell speeded up any after we reached the pavement, I wasn't in a position to see the speedometer; would have had to have raised up and looked over to have seen it. When we crossed Cash Creek bridge the road makes a kind of a little S curve, and then straightens out; the light would naturally shine to the side of the road toward the woods. The road curves and crosses around to the south and then across another

small viaduct; yes, sir, we were over on the bridge or just west of it, I won't say for sure, when the lights of the truck showed up the road some place between the center and somewhere to the edge of the bridge when I saw the truck lights; we did not run off the pavement as we come around the S curve, our car run off the pavement just before the truck hit us, just off the curve. Our car was facing up right, I don't know whether the road runs east or not; we had two wheels off the pavement when the truck hit us; my judgment is the truck was traveling at a terrific rate of speed; the truck hit our left front fender and it seemed to me the truck shoved our car back just a little; instead of pushing it back it just seemed to mash us down; our car did not go into the fence. When I left the scene of the accident the car was facing east like it was when the truck hit us; I did not pay much attention whether the back end was pushed around or not; I don't know what happened after I left the scene of the accident; when I first saw the truck I could not tell exactly where it was, whether it was up in the center of the road, the closer I come the more I could tell about it. I could not tell how far away the truck was, it appeared to me that Mr. Caldwell drove up across the pavement and the truck came over across the road and hit our car; that truck was a Ford V8, I saw an Old Style Lager Beer sign on it; when I noticed the defendant he was standing in the road; I don't know when he left, he just disappeared; I did not see him running."

B. W. Russell was a witness for the state and stated:

"I live at Walters, Oklahoma; was living there on November 13, 1935; the evening the collision occurred I was going east to Hulin, I should judge around seven o'clock in the evening; I was at the scene of the accident shortly after it occurred; before I got to the scene of the accident I saw someone running; I don't know who it was; he was probably 100 yards from the truck when I met him; I was west of the truck and the man was running west toward Walters, just off the concrete slab; I do not remember his hat or the kind of clothes he wore; he was tall and a thin man the best I could tell."

On cross-examination he stated he just noticed somebody running, "I thought I was going to be hi-jacked."

J. B. Thorne worked at the Stimpson-Chevrolet in Walters, Okla., on the 13th day of November, 1935:

"At the request of the county attorney I examined the tires of the truck and the car after the two vehicles were brought to the garage; I do not remember just when I examined them but it was within a reasonable length of time after the accident. There were some marks on the tires of the truck to the effect that they skidded sideways, they seem to have drug as you drag a tire, I would not say they were straight across, either as the truck turned over on the side they skidded—there were some marks on the front wheel, they seemed to be going more than cross ways on the gravel, these marks extending up the side walls some; I could not say as to whether or not the inside wheel on the truck appeared to be worn in the same manner as the outside tire; one of the front wheel tires was completely blown out and considerably used. Off hand I would say the truck weighed around 4500 pounds; when the wrecker was sent out to bring the truck in the truck was there on its side, it had not been set up when I got there; the skidding marks on the tires could have been made when the truck was raised up; it couldn't be raised without making some marks; when the truck was turned over the skids could have made those marks at that time. You can skid a tire without showing any appreciable marks—a reasonable skid we will say depends on the tires— I have seen them skid and not see any signs of damage; I would not say the marks were not made by the skidding of the car; I did not see any."

Gettie Johnson, testifying for the state, stated:

"On the evening of the accident the defendant, accompanied by his brother Riley Haithcock, was in my restaurant"; that the defendant drank two cups of coffee, and probably a little more.

Mrs. M. C. Graham testified:

"I was in Walters the night of the accident; the defendant came to where I was some time after the accident and drank two cups of coffee, and probably a little more; the defendant was not intoxicated; had no appearance whatever of being intoxicated at that time; I did not smell any odor of whisky on his breath; he appeared to be dazed from his injury but he was not drunk."

On cross-examination witness stated:

"I do not know what caused him to be dazed, I suppose the lick on his head caused that; if I had a lick like that on my head I would be crazy too."

Tom Christian testified he made pictures at the scene of the accident the next day or shortly after the accident, also the car and truck, which pictures were introduced in evidence. The pictures were made somewhere down around the garage where the vehicles had been taken after the accident; witness was not positive as to the time he made the pictures. Witness was questioned at length as to when and where the pictures were made, and stated he did not see the truck or car before they were moved. The accident occurred about two miles from Walters. Witness was then examined at length as to the injury to the post at the scene of the accident, as to the marks on the pavement, and the distance the marks were relative to the position of the truck.

A. T. Bull stated he lived east of Walters about 2½ miles:

"I was down at the scene of the accident on the 13th day of November, 1935; when I saw the truck it was on the right side facing east, the bulk of the load fell over north, it did not all fall out of the truck."

Witness was examined as to the condition of the slab, the marks on the pavement, and the general appearance of the road where the accident occurred, and stated:

"The truck was lying on the right side, the left front wheel was off, and as that turned the truck off at a certain point all the weight was on the tires sideways as you turned it up; the post near the truck had yellow paint on it."

L. C. Henderson testifying for the state stated he was sheriff on the 13th day of November, 1935:

"The day the accident was reported to me, it was after dark a little bit, probably 9 o'clock, I can't say exactly what time; I saw the defendant in front of Dr. Harned's Drug Store; I am quite sure he had been to Dr. Jones' office, I think he told me he had been to the Doctor's office.

"The county attorney talked with Mr. Haithcock in my office that evening; it must have been a couple of hours after the accident; I smelled the defendant's breath, it smelled a little bit like he had been drinking beer; I would say he had a drink of something, I think he said he had a bottle of 3.2 beer; before the defendant was engaged in the conversation I think he was advised of his constitutional rights; I don't know, don't remember whether he was or not, or the conversation, Floyd, you do that so frequently I do not remember you omitting it. I feel quite sure he was. The best of my recollection is the defendant did not know how the accident happened, it was done before he knew what had happened, that is the best of my memory, I don't remember his words."

On cross-examination the sheriff stated:

"At the time the county attorney was talking to the defendant he appeared to be somewhat in a dazed condition; he had an injury on his head; he talked freely; I realized he was in kind of an excited condition."

Claud Heron, testifying for the state, stated he examined the car and truck at the Chevrolet garage:

"I also made observation of the road regarding the markings on the concrete where the accident occurred;

the line of the fence along side the road is about five or five and one-half feet; I noticed on the concrete the next morning where rubber has been skidded or burned on the concrete; the rubber marks were passing the east end of the bridge about three feet, about in the center of the concrete, a little bit to the north, the approximate length was about 23 feet."

A plat was presented to the witness, and witness examined the same:

"It would be about four or four and one-half feet from the west edge of the north burn to the north side of the pavement from the rubber marks."

On cross-examination witness stated the skids shown on the pavement and burned places on the north side of the road were practically straight for about 23 feet:

"We measured it in the presence of everybody. The one on the other side went in a southwestern direction, we measured that by actual measure, it was 25 feet and angled some."

Witness then tells about there being a post on the north side of the road struck by the truck, which left some paint the color the truck was painted on it.

J. M. Thompson, testifying for the state, stated:

"I live in Walters, own and operate the Thompson Hospital; was operating it on the 13th day of November, 1935; I treated a number of parties on that evening; Mrs. A. L. Jackson was one of them, and a Mr. Caldwell."

The defendant demurred to the evidence offered on the part of the state for the reason that the same wholly failed to prove facts sufficient to constitute and prove the commission of the offense charged, or any offense on the part of the defendant against the laws of the state of Oklahoma, and more especially fails to prove the offense

for which he is charged in the information. The demurrer was overruled and exceptions reserved.

C. T. Smith, testifying for the defendant, stated:

"My name is C. T. Smith; I live at Rush Springs, Oklahoma; am in the cafe business; know the defendant, saw him in my cafe the day prior to the accident that evening; it was about noon and he was sober."

On cross-examination witness stated:

"It was somewhere near noon, I am not sure exactly what time it was."

Carl Wilson, testifying for the defendant, stated:

"My name is Carl Wilson; I live 11 miles east and one mile north at Corum, Okla.; I was operating a filling station and working there on November 13, 1935; I know Jim Haithcock, he was at my station some time that evening before the accident, around eight o'clock, I imagine. He bought gasoline and I serviced his truck for him, I may have put in some oil, I don't remember; he drove up to the station in an orderly manner and drove away in the same manner; there was nothing unusual about his actions, he often stopped at my station and serviced his car; he stopped at the proper place to get bronze gas, the kind he usually used. He was there about 10 minutes and seemed to be perfectly normal. If he was under the influence of intoxicating liquor I did not see anything to indicate it; I think he was sober on that occasion."

On cross-examination witness stated defendant got out of his truck and went into his place of business where his father was:

"I watched him as he came into the station to have his truck serviced, which is the custom for me; I heard no loud talking while I was servicing the car."

M. A. Jones, testifying for the state, stated:

"My name is M. A. Jones, I am a practicing physician and surgeon; I reside in Walters, Oklahoma; know the defendant Jim Haithcock; he came to my office on the 13th of November, 1935, I couldn't state the hour; he had a wound in the top of his head about two and one-half inches long, it was a laceration of the scalp that went clear through to the skull; the skull at that point is about one-eighth of an inch thick; the injury would indicate a rather pronounced blow; he had some blood on his face and hair like he might have bled; I closed the wound with stasis, that is what we usually call stitches, used in place of stitches, I put four in to close this wound; when I was treating this wound he was in the surgical chair; I was in front of him, I will show you—all right— his face was closer to mine than yours is; part of the time I was treating him his face was probably as close as five or six inches; I did not detect any intoxicating liquor of any kind on his breath; there was nothing occurred while he was in the office that indicated he was under the influence of intoxicating liquor. Considering the injury the defendant had I wouldn't have been surprised if he had been out of his mind. About 13 per cent. of human being is blood; it takes about three per cent. alcohol to produce a state of intoxication; the alcohol is eliminated through the skin, through the urine, and by perspiration through the skin; when I talk of smelling intoxicating liquor on a fellow's breath that is because it is leaving his system. I believe the deputy sheriff brought the defendant to my office. My recollection is there was two men along with him, could not say who they were, could not be positive as to a deputy sheriff, that is my impression, it has been quite a while ago."

On redirect examination witness states he has been practicing in Walters since 1902.

Lucy B. Leonard, testifying for the defendant, stated:

"I live in Duncan, Oklahoma; I remember the accident on the 13th of November, 1935, in which the defendant was; I saw the defendant on the day prior to the

accident that evening some time in the afternoon; the defendant was sober at the time."

On cross-examination witness stated she did not remember just what time "but I think it was later than twelve o'clock."

The defendant, testifying in his own behalf, stated:

"I am 37 years of age, work for the Cotton County Wholesale Grocer Company; prior to the time the company began handling 3.2 beer I delivered groceries for it. We work all the territory close around; I hauled beer from St. Louis. I never had an accident prior to the accident in this case, which occurred on November 13, 1935. The day of the accident I left Walters at nine o'clock for Rush Springs, driving a Ford V8 truck, wheel base 131 inches; I stopped at the G & M Cafe, Comanche; Mrs. McIlvain was in the restaurant; when I left Walters I had about 2,500 to 3,000 pounds of beer; the truck weighed about 4,500 pounds; I then drove to Duncan and stopped at the Elks Club."

The defendant discussed in detail the route he traveled the day of the accident in the evening and admits a number of places on the route he drank the contents of a bottle of 3.2 beer.

The defendant tells the number of business men he called on during the day, and admits he stopped at Corum, 8 miles from Comanche, during his return trip, and Carl Wilson serviced his car. The defendant stated Corum is about 12 miles from Walters and 10 miles from Corum to where the accident occurred:

"I drove from Corum in a careful manner, I met some cars on the highway and passed some; I had my lights on. When I first saw the lights on the car that I had the collision with I was on the viaduct beyond the Cash Creek bridge, not very far; at the time I was driving about 35 miles per hour, the speed limit of the truck;

the lights I saw when I was on the viaduct were up and west, I don't know just how far away; they were bright and I watched my side of the road and kept driving, I never did see the car, I was looking at the road, and kept on my side of it; all I remember something hit, the next thing I remember I was up town at Mrs. Brummett's; I do not recall anything that occurred from the time of the crash until I was at Brummett's; I do not recall talking to Mr. Jackson; I don't know how I got to town; I do not know who all was at Brummett's; I had never met Mrs. Graham before, I can hardly recall being at the Doctor's office. I drank coffee in the cafe; I don't know who was with me; I do not know who took me to the sheriff's office; I kindly like a dream remember being down to the courthouse; I do not know when I was down at the courthouse; I think I went home and was in bed until Saturday some time, I came down Saturday and went to jail."

On cross-examination the defendant stated:

"The doctor did not send me to the hospital; I remember very little after the collision; the first thing I remember is being up at the house; I don't remember running up the highway, or getting out of breath; at the time I lived at Mrs. Jones' about a block and a half from the wholesale house; I don't know why I did not go home instead of stopping at Mrs. Brummett's; I did not try to sober up before the officers saw me for the reason I was not drunk, I wasn't even intoxicated; I drank a bottle of 3.2 beer about 11 o'clock at the Elks Club; I was not drinking as fast as I could hold it, it has no effect on me."

Several pages are taken up by the state as to the number of bottles of beer the defendant drank during the day, and defendant admits he drank several bottles of beer during the day from 11 o'clock in the morning until some time in the evening. The record shows he had driven about 10 miles from Corum without stopping to the place where the collision occurred.

"I arrived at Corum about 6:22 or 6:25; remember talking to Mr. Wilson and what he said, and I thought he was kidding; I knew I could drive the truck safely, I was not getting drunk, was not intoxicated at all. I drove about 30 to 35 miles; I did not see the car I had the collision with at any time, I remember seeing the lights when I was on the viaduct, which is a distance of 30 or 40 steps from where the collision occurred. Yes, I saw the lights on the car just preceding the collision; after I saw the light I just noticed my side of the road; I did not fail to make the turn on the curve and run into the parties that were injured. I don't know how the accident happened, I imagine they would have to be on the north side of the road, I am not attempting to say they were; I do not remember hearing the bottles click when I turned over; I do not remember how I got out of the truck and do not remember talking to Mr. Jackson; do not remember going toward Mr. Jackson's car or telling him to hail a car that was coming by; I do not remember anything after the collision; I was wearing a cap at the time that was left at the wreck, the cap is at the wholesale house and has a hole in it. The woman might have given me coffee that night, I remember drinking some coffee; I remember something about being in the courthouse; I do not know that I could tell just when I left Walters. I ate dinner at Marlow between 11 and 12 o'clock."

C. T. Timpson, testifying for the state, stated:

"My name is C. T. Timpson; I live at Walters, I am in the Chevrolet business, principally parts; on the 13th day of November, 1935, I went to the scene of the accident, I cannot say what time I was there, but before the car and truck was taken away; the truck was on the north side facing east, I would say right at the edge of the curve; the car was setting east on the south side four or five feet to the east of the truck, three wheels of the car were on the concrete slab, two front wheels and the rear left wheel; the vehicles were removed to my place of business; I went out the next morning be-

tween nine and 10 o'clock and investigated and saw where the car and truck were lying, etc. I saw a post on the north side that had been struck by the truck, I think it was the third post from the west end."

On cross-examination witness stated:

"I could not state what part of the truck struck the post but it was possibly some metal that struck it, possibly the end of the body, the steel support that comes down in the truck, it would be my judgment that some part of the truck made the mark."

The witness said the left front wheel of the truck was completely off.

Allen West, on redirect examination, stated:

"I live at Walters, and sell Ford products. My motor company sold the Ford truck that was in the collision to the Cotton County Wholesale Grocers; the statement you hand me is a carbon copy of the original statement, duplicate copy of the statement of the sale of this truck."

R. L. Patty was recalled and testified for the defendant that he saw the defendant on the evening of the accident, and before it occurred, about 6 or 6:30 in the afternoon:

"I talked with him at my store, he was there about five minutes, he was not intoxicated."

A. G. Jackson stated he lived at 110 South Fifth street, Walters, Okla.:

"As a mechanic I examined the wheels and tires of the truck; the left front wheel was off. I removed the tire from it; at the time I took the tire off I observed something that indicated a skid, I don't know what caused it; the tire is in the same condition practically that it was when I examined it."

On cross-examination he stated he did not know whose possession it had been in since the accident; he bought the paint for Mr. Gilliland to put the markings on the tire; the tire was taken off the wheel to save it for further use.

H. C. Chrisman, testifying for the defendant, stated:

"I live in Oklahoma City; I work for Clint Morrison's Service Station; it is a general repair shop; my business is to appraise and estimate automobiles for the company; I have to know automobiles, their general construction; I made a report on this wreck to the State Highway Commission. I made an examination of the truck at the request of Mr. Sass to see whether or not it was worth repairing; while examining the truck I took measures of the highway where the accident occurred with a standard steel tape; I observed some marks on the pavement partly erased by the rain or something; there were slight skid marks remaining; there is a little kind of a ridge at the edge of the pavement, it was scraped some 15 or 20 feet down; the black line shown is about six inches of curbing on the edge of the highway, just a slight slope; there was a dent on the third post on this side, indications showed about one-fourth or one-half inch at top; I found some yellow paint; the width of the pavement at the place where the collision occurred is 19 feet six inches, the curb cannot be traveled there. About 15 feet down along this line and on the edge over here and toward the edge of the pavement there is a little kind of a ridge, it was scraped some 15 or 20 feet on down."

Witness then described the distance and measurements he made at the scene of the accident, and gave in detail the location of the wheels, the skidding and where the vehicles landed after the accident.

Witness was cross-examined at length as to why he came down to Walters, and who was going to pay him for it. Most of the cross-examination was immaterial, and does not tend to establish any facts in the case.

J. D. Simmons, called in rebuttal, stated:

"I live four miles southwest of Comanche, in Stephens county; I came to Walters on November 13, 1935, traveling in a car; I was riding in the front seat of the car with Mr. Caldwell who was driving. At the time immediately preceding the collision we ran off the south side of the highway."

The foregoing is, in substance, the testimony of both the state and the defendant.

The defendant has assigned nine errors which he considers sufficient to justify this court in reversing his case. The first assignment is the court erred in overruling plaintiff in error's motion for a new trial.

The defendant contends that the record discloses that he was not to blame for the accident; that his guilt or innocence depends upon whether or not the defendant made both of the skids or rubber burns on the road as testified to by the witnesses; that the location, width and length of these marks are admitted by both the state and the defense. These marks were photographed in the presence of the defendant's attorney, the county attorney, and others. In connection with the marks, the state contends that the accident occurred on the highway where the car was found immediately thereafter; the witness A. L. Jackson testifying that the car was off the pavement and the truck came across from the north side of the road at a terrific rate of speed and crashed into the car which after the accident was at the same place as when struck. The state further contends that the truck made both of the skids or rubber burns upon the paving. All of the testimony, including the markings of the skids, the photographs of the scene of the accident, the car and the truck, was admitted in evidence to the jury.

The defendant argues that it would be physically impossible for the truck he was driving to have made both

marks on the highway. The defendant was alone and driving the truck, and as between the defendant and A. L. Jackson, the defendant being in a better position to know the facts, the defendant urges his testimony is corroborated by the physical facts. The state in its brief insists that the defendant was under the influence of intoxicating liquor and when the accident occurred he was rounding a curve on the inside, and that he was so intoxicated and was driving at such a rate of speed that he was unable to control his truck; that his truck was on the wrong side of the road making the curve and collided with the car in which the deceased, A. L. Jackson, and others were driving. The state further contends that the testimony conclusively shows that during the day and just prior to the collision the defendant had drunk 10 or more bottles of 3.2 beer, and at the time of the collision he was intoxicated, was driving at a careless and reckless speed on the highway, amounting to culpable disregard of the rights and safety of others, thereby causing the death of another.

The motion of the defendant for a new trial includes all the other assignments of error complained of by the defendant. The defendant complains the court committed prejudicial error in the trial of his case by permitting Jerome Sullivan, an attorney, to appear in his case as a special prosecutor, and argues at length that Mr. Sullivan had been attorney for plaintiff in some suits brought against the owners of the truck for whom the defendant was driving at the time of the accident. This complaint is without merit. By permission of the court the attorney had a perfect right to appear and assist the county attorney in the prosecution. It was not error for Mr. Sullivan to appear.

The defendant argues further that the verdict of the jury is contrary to and in disregard to the court's instructions; that the punishment fixed by the jury is excessive, appearing to have been the result of bias or prejudice; that the verdict is not supported by the law and the evidence.

An examination of the record fails to disclose that the jury failed to regard the court's instructions. The court in its instructions advised the jury as to the law applicable to the facts introduced in evidence before it, and the verdict of the jury finding the defendant guilty of manslaughter in the first degree, and assessing his punishment at eight years, does not show that the jury disregarded the instructions of the court but reached its verdict after having considered the instructions of the court on murder, and manslaughter in the first and second degree.

The defendant further complains that the verdict of the jury is excessive, appearing to have been the result of bias and prejudice. There is nothing in the record to show there was any bias or prejudice in the minds of the jury when it returned the verdict. The defendant argues that the verdict of the jury is not supported by the evidence, and is contrary to the law and the evidence. With this contention we cannot agree. The defendant was placed upon trial on a charge of murder alleged to have been committed while under the influence of intoxicating liquor, and while driving at a careless and reckless rate of speed upon the highway. The facts show that this defendant was driving for his employers, from town to town, delivering merchandise to customers of his employers; that in the evening he was returning to his home, driving the truck partly loaded with 3.2 beer and partly empty cases and bottles. The defendant denies he was intoxicated, or under

the influence of intoxicating liquor, but admits he started out about 9 o'clock that morning, and up until the time of the accident he had drunk 12 bottles of beer. As the defendant was returning home he stopped at a filling station to have his truck serviced, and while his truck was being serviced he went into the station room and as he came out the father of the young man who was servicing his car asked him if he thought he was able to drive home, and he answered him saying, yes. The defendant says he thought the party was joking him and did not realize the party who testified in the case was in earnest.

The defendant in his testimony shows that just before the collision occurred he saw the light of the car coming meeting him, that he paid no attention to it, and was just looking ahead watching his side of the road when he rounded the curve and the collision occurred. The defendant further says that from the time of the collision until some time later in the evening up in town he did not know what happened. He did not know how he got to town, whether he ran or walked. One of the parties riding in the car where the accident occurred that killed Mrs. Jackson and injured others stated he saw a fellow coming toward the car and called to him to come and help, that some of the parties were killed, and that he turned and went the other way. Another party testifying for the state claims that immediately after the collision he met a party running toward town, but he did not know who it was.

Mr. Jackson, a witness for the state, who was riding in the car with his wife, who was killed, states they were driving at the proper rate of speed, and that the right-hand car wheels were off the slab at the time the truck struck the car in which Mrs. Jackson was riding.

Several parties testified to the marks on the pavement. The defendant insists that the truck and car came together in the center of the pavement, and the state insists they did not. It is perfectly apparent from the record and the condition of the car in which Mrs. Jackson was riding at the time of the collision that caused her death that the car could not have been where it was located after the accident for the reason that the evidence shows that the impact of the car and truck were such that the truck was knocked backward and completely turned over on its side off the slab and against the guard posts, and the car was standing with two of its wheels on the slab badly crushed, and the other two on the shoulder. If the car had been where the witness stated it was at the time it was struck by the truck, as heavy as the proof shows this truck to be, the car would have either turned over or have been knocked or forced back a considerable distance. The physical facts in this case clearly show that the driver of the car in which Mrs. Jackson was riding when she received the injury that caused her death was rounding a curve, and that the truck driven by the defendant was also rounding a curve, the car being on the outside of the curve, and when in making the curve the truck did not keep on its side of the road, neither did the car. That the defendant in this case by his own admission was not paying attention after he had seen the car light and the two vehicles came together in the center of the highway, resulting in the death of Mrs. Jackson, and injuring others.

It is perfectly clear from the evidence that the defendant was intoxicated to such an extent that he was driving in a careless and reckless manner upon the highway endangering the life of Mrs. Jackson and having an utter disregard for the safety of those who might be on the highway.

There is a conflict in the evidence as to the speed the defendant was driving, and as to the point on the highway where the vehicles came together. The defendant very earnestly and forcibly argues that the testimony is not sufficient to sustain the conviction. The jury heard all the testimony, saw the witnesses on the stand and observed their demeanor. It was for the jury to say whom they would believe or disbelieve. It is evident from the verdict returned the jury did not believe the defendant was testifying to the truth, and by its verdict harmonized the conflict in the evidence between the state and the defendant and decided against the defendant and returned a verdict of guilty of manslaughter in the first degree, fixing his punishment at eight years in the penitentiary. The question of the sufficiency of the evidence has been before this court many times and the court has universally held that where there is any competent evidence which reasonably sustains the verdict of the jury a conviction will not be reversed although the evidence may be conflicting or different inferences may be drawn from it.

Section 3206, O. S. 1931, 22 Okla. St. Ann. § 1068, is as follows:

"No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

The weight of the evidence clearly shows an utter disregard for human life by the defendant, and that he did not drive with care and caution, nor did he try to con-

trol his car or respect the rights of others on the highways of the state; that he was driving in a fast and reckless manner endangering the lives of others.

The jury is the exclusive judge of the weight of the evidence, and if there is such a conflict that different inferences can properly be drawn from it, the jury's determination will not be interfered with unless it is clearly against the weight of the evidence or it appears to have been influenced by passion or prejudice. Choate v. State, 37 Okla. Cr. 314, 258 Pac. 360; Clemmer v. State, 56 Okla. Cr. 354, 40 Pac. 2d 37; Holford v. State, 57 Okla. Cr. 431, 48 Pac. 2d 1082; A. G. Goodnight v. State, 62 Okla. Cr. 382, 71 Pac. 2d 789; John Coppage v. State, 62 Okla. Cr. 325, 71 Pac. 2d 509; and John Williams v. State, 63 Okla. Cr. 234, 74 Pac. 2d 632.

There is nothing in the record to show that the verdict of the jury is against the weight of the evidence, nor does the record show the jury was influenced by passion or prejudice.

After carefully examining and studying the evidence we hold the evidence is sufficient to sustain the judgment. The instructions given by the court on its own motion are the usual instructions given in cases where the defendant is charged with murder, and they correctly state the law applicable to the facts, and are as favorable to the defendant as the evidence in the case will warrant. The court did not err in refusing requested instructions, if the law covered by the requested instructions is fully and fairly covered by the court's general instructions. Hamilton v. State, 38 Okla. Cr. 62, 259 Pac. 168; Wheat v. State, 38 Okla. Cr. 119, 259 Pac. 279.

The defendant complains of other errors committed by the trial court. An examination of the record dis-

closes that the other errors complained of are without sufficient merit to require a separate discussion in this opinion. The facts in the case show that the defendant willfully, carelessly and negligently, and while under the influence of intoxicating liquor, drove his truck at an excessive rate of speed on the highway, and while rounding a curve, disregarding the rights of the public, and endangering not only the life of the woman killed, but all others that might be on the highway at the time, and showed an utter disregard for all the rules of the road and the laws of the state.

In this case the jury took a very liberal view of the facts and returned its verdict of guilty of manslaughter in the first degree, and imposed a penitentiary sentence of eight years upon the defendant.

The defendant was properly and fairly tried. The instructions of the court substantially covered all the law as applied to the facts in the case. The evidence is amply sufficient to sustain the judgment. Finding no errors in the record to justify this court in setting aside the verdict and granting a new trial, the judgment of the trial court is affirmed.

DOYLE and BAREFOOT, JJ., concur.