## F. E. WILLIAMS v. STATE.

No. A-9331. Dec. 10, 1937.

(74 P. 2d 632.)

F. E. Sides, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, P. J. John Williams was by information charged with the murder of Myrtle Lambeth; was tried, convicted and sentenced to life imprisonment. Motion for new trial was filed, considered, overruled, exceptions saved and the plaintiff in error has appealed. Hereafter the plaintiff in error will be referred to as the defendant. The charging part of the information, omitting the caption and signature, is as follows:

"In the name and by the authority of the state of Oklahoma, comes now Lewis R. Morris, the duly qualified and acting county attorney in and for Oklahoma county, state of Oklahoma, and on his official oath gives the district court in and for said Oklahoma county and the state of Oklahoma, to know and be informed that heretofore, to wit: on the 15th day of September, A. D. 1936, in Oklahoma county, state of Oklahoma, John Williams whose more full and correct name is to your informant unknown, then and there being, did then and there willfully, and unlawfully, and feloniously commit the crime of murder in the manner and form as follows to wit: That is to say, the said defendant in the county and state aforesaid, and on the day and year aforesaid, then and there being, did then and there knowingly, willfully, and feloniously, without authority of law and with the premeditated design to take the life of Myrtle Lambeth, drive, propel and operate a certain automobile to wit: a 1936 Ford Tudor sedan, 1936 Oklahoma license No. 234-050, upon a public highway, to wit: on South Walker street in the 1000 block in Oklahoma City, said county and state, while under the influence of intoxicating liquor, and in a careless, reckless and negligent manner, and in a manner imminently dangerous to others and evincing a depraved mind, regardless of human life, and the said defendant, while driving said automobile as aforesaid, did drive said automobile into and against the body of the said Myrtle Lambeth with such force and in such manner as to then and there inflict certain mortal wounds upon the body of the said Myrtle Lambeth, from which mortal wounds so inflicted, as aforesaid, the said Myrtle Lambeth did die instantly, as was intended by the said defendant, contrary to the form of the statutes in such cases made and provided against the peace and dignity of the state of Oklahoma."

The state to sustain its allegations called R. D. Lambeth, who in substance stated:

"I lived at 505 Southwest Tenth street, in Oklahoma City, on the 15th day of September, 1936; was employed as

a street car motorman for the Oklahoma Railway Company; at the northwest corner of the intersection there is a filling station, where the street runs into Walker there is a jog of some 18 feet, about 45 degree angle across Walker; the Garrett Grocery was nearer there where Tenth street goes east; on the east side of Tenth street is a filling station; the grocery store is operated by Mr. Chapman and his wife; Myrtle Lambeth was 25 years old, September 15, 1936; I got off from work at 2:09 and got to the hospital at 2:30, my wife was dead when I got there; we had been married one year, four months, and two days."

Mrs. J. L. Chapman, testifying for the state, stated:

"I was in the grocery business located at 435 Southwest Tenth street, just east of the filling station on the corner of Tenth and Walker; during her lifetime Myrtle Lambeth was a customer of mine; I remember the day she was killed; I did not go to the scene of the accident until after the accident was over; I saw the deceased about 20 minutes before the accident, she was in the store and purchased some things; she lived on Tenth street west of our store, and west of Walker street; the first I knew that the accident occurred the filling station boy brought in a grocery book and asked me if I knew the lady; the book had dropped out of her hand; I told the boy it was Mrs. Lambeth; that was about 20 minutes after Mrs. Lambeth made her purchases and left the store."

Gus Benedict, called as a witness, testified:

"I live at 609 Southwest 29th street; I am well acquainted with Walker and Tenth street; there is a little Catholic school on the west side of the street, and the Washington school on the south side of Reno street on Walker. Mrs. Lambeth was killed at Southwest Tenth and Walker. I was sitting in a Ford car on Pine, on the south end of the viaduct or underpass, that would be in the 1000 block; my car was in motion facing south ready to make a turn, and I saw the defendant strike Mrs. Lambeth; she was about the middle of the street on

Walker going west; there is a double street car track where two cars can pass; I saw the car hit her with the left front fender. I have had experience with driving cars and this car was making 40 miles an hour; when the car struck Mrs. Lambeth she bounced up on the hood and from the hood to the windshield, and then tumbled off in the street to the left of the automobile; the car the defendant was driving kept going on north on the east side of the underpass; the last time I saw the car it went on through the underpass; I got out of my car and went and picked up the lady's shoes and her bundles, one of which was a package of meat. I helped pick the woman up; she was badly bruised and was not breathing; she was laid on the curb and an ambulance called; a lady came out with a blanket and put it under her head. I am not sure how far it was from where the car struck Mrs. Lambeth to where her body was picked up, but I judge it was about 15 or more feet; I did not see the defendant, did not go up to where his car stopped. I saw some cars start out and follow the defendant."

Witness was cross-examined at length, but his testimony was not changed on cross-examination.

Herman Baker was next called as a witness for the state and stated:

"I am 21 years old, lived at 3600 Northwest 12th street; I was carrying the Oklahoman and Times; I remember the occasion when Mrs. Lambeth was struck by an automobile and killed, at Tenth and Walker; the accident happened about two o'clock in the afternoon, I was driving north in a 1933 Chevrolet; the first thing that attracted my attention was a truck honking at the car making too much speed; the car was a Ford V8, and passed me on the north end of the viaduct; the Ford was making forty or 45 miles an hour, and the truck was not very far behind when they passed the Little Flower School, on Walker; I saw Mrs. Lambeth when the car struck her; the car carried her a ways before she fell off, her body went up in the air; she hit the pavement just

before she got to the underpass; I was on the north side of Tenth street.

"The Ford did not stop when it hit the woman, and did not stop when she fell off, it seemed like it picked up more speed after it hit her; I followed the Ford car and truck through the underpass; saw the Ford V8 hit a sign when it turned at the corner of the Washington School; the Ford V8 went up over the curbing and hit a telephone pole and made a sudden stop; he then acted like he was going to back out but could not; I went over to the car and saw the defendant, John Williams, there, he was the man that was driving the Ford V8 that ran over the woman; there was a whisky bottle in the car, somebody grabbed it. I did not know who the defendant was; he sat there in his car until one of the officers walked over to the car and took him out; I did not hear the defendant say anything; the officer arrived a few minutes after the defendant hit the school sign and telephone pole. When the officer took the man out of the car he stood up. I went down to where the woman was and they had removed her remains in an ambulance. The last time I saw the whisky bottle some policeman had it in his hands. There was a strong whisky smell in and around the car. No one was in the car but the defendant. The defendant was driving about 50 miles an hour, and seemed to slow down a little after the accident, but gained it right back."

On cross-examination the substance of the witness' testimony was the same as on his direct examination.

George E. Williamson, called on behalf of the state, testified:

"I was a policeman at Walker and Tenth, and the Union Depot southwest of 10th street; on south Walker there are two sets of tracks, and at Walker and Tenth there is a jog. On the afternoon of September 15, 1936, I was on duty and remember the occasion of Mrs. Lambeth being killed; I was on the east side of Walker street, near a shoeshop, and saw her when the car hit her; I

could not tell at the time whether it was a man or a woman; when the car struck her she was in the middle of the west side of the center of Walker; I saw the back of the car that struck her and thought it was a Ford; this was in a school zone and the speed limit was 15 miles an hour; the day she was struck was a school day; I judge the man was driving about 45 or 50 miles an hour; the car was going north in the middle of the street when it hit the woman, her body went up in the air and came down on her head on the west side of the car, and the driver kept going.

"The car swerved back into the line of traffic and went down under the underpass; some cars were following him, and I went to get an ambulance and called the police station; by the time I got to the scene of the accident they had carried the lady over to the parking; I stepped over where the car hit the deceased, and to where she fell, and it was 71 feet; by the time I reached her, after I had called the police station she was just breathing a little, she was bruised and had a hole in her head and one of her legs was broken. She was bleeding from the mouth and from the head."

Homer Keith was called as a witness and testified on behalf of the state:

"I live at 504 South Walker; I am now 21 years old; was working for Bailey at 1021 Southwest Walker on September 15, 1936, at a filling station; the station is on the north side of Tenth street and faces on Walker; I remember the occasion of Mrs. Lambeth being hit by an automobile; I was standing at the filling station; about the time she got to the middle of the street the defendant hit her and dragged her something like 60 feet; he seemed to speed up after he hit her; after knocking and dragging her some 60 feet she rolled off the car; I do not know how to drive a car but I have ridden in cars. After he hit the woman he did not stop but speeded on across and went faster and on down Walker street under the underpass."

R. L. Tomlinson was called as a witness for the state and stated:

"I live at 1017 South Walker; my barbershop was located at 1017 South Walker on the 15th day of September, 1936; I remember the woman being killed at Southwest Tenth and Walker; I saw a part of it; I knew the woman when I saw her; I did not see her that day prior to the accident; I had just walked out on my porch and was standing there when the accident occurred; my shop was on the west side of Walker street facing east; I did not see her until she was struck; I heard the noise, looked up and saw Mrs. Lambeth on the front of the car, on the left side of the hood lying back over the car, the car was going; I have observed traffic and ridden in cars, and in my judgment this car was making 45 or 50 miles an hour; it was a new black sedan or closed car, I could not tell the make of the car; when I first saw the car and heard the impact, the woman was on the car, the car threw the woman off on the north side of Tenth anywhere from 40 to 60 feet; I tried to catch the number of the car, but did not get it, then I ran up to where the lady was; the car that hit her pulled on to the other side of the street and went through the underpass, it did not stop; several parties assisted me and we carried the remains of the lady over on the parking; she was cut across the head and blood was running from her eyes and ears when I picked her up; her left leg was broken, and she was unconscious."

Albert Salazer, testifying for the state, stated:

"I am a music teacher, live at 1012 West Tenth street; I remember when the lady was killed at Tenth and Walker, on the 15th day of September, 1936; I was in the front yard working on my car; saw the lady come across the street from the grocery store with some packages under her arm; I saw her until she reached the middle of the street; before she started across the street she stopped and looked to the north and south, looked both ways, and then started walking; there were two street car lines

there where she started to cross, that makes four tracks; when she got to the third rail I saw the car hit her; I could not tell what rate of speed the car was making. I have been driving a car for 12 years, and in my judgment the car was making 45 or 50 miles an hour. The car hit the deceased and threw her in the air and she came down on her head; from the time the car struck her until she fell on the pavement she was carried about 50 feet and landed on the west side of the tracks; the defendant slowed down a little and then speeded up and went down under the underpass; I then went to the lady and tried to pick her up and get her off the street; she was wearing a light house dress; when I picked her up I learned her left side was injured, and I could not pick her up by myself; some other parties came and helped me, blood was running from her mouth; I could not tell whether she was breathing or not, she was relaxed and unconscious."

K. B. Garrett testified he was a member of the Oklahoma police department; at the request of the county attorney he made a plat and map of Tenth and Walker, which shows the measurements from the sidewalks and streets, and also shows the distance involved in this lawsuit. The plat was introduced in evidence.

Edgar Lohner was called as a witness and testified, in substance:

"I am 26 years old and live at 514 South Dewey; I was a truck driver for the WPA on September 15, 1936; I was driving behind the automobile driven by the defendant and saw the car he was driving, the car that struck the woman, the man had driven by me and caused me to pull over to the curb to let him pass. I had pulled over to the east curb.

"I was driving a long base 1933 Chevrolet truck; I was following the car, was about a short block behind him at the time he struck the woman. The man was driving a 1936 Ford V8 sedan; the defendant here is the man

I saw driving the car; after the defendant passed me he seemed to be nodding his head and drove on down the viaduct a little ways and pulled over to the left side of the street, he was plumb over on the wrong side of the street and waivered back to the east side of the street; I saw there was something wrong with him and pulled up by the side of him just before he drove off the viaduct and asked him to stop; he ignored my signal so I pulled in behind him and drove on down the street; it was somewhere in the neighborhood of the 300 block from the big bridge or viaduct to where the accident happened. I first saw the woman on the east curb of Tenth street stepping off the street to Walker; she was going west, Tenth street does not go straight through; she was walking like anyone would stepping off the curb to cross the street; she was going straight across; when the man struck her she was almost to the second set of street car tracks on the west side of Walker street; I had no speedometer on my truck and therefore could not tell how fast the man was driving; after he struck the woman she came up in the air on the left side of the car, it threw her about three feet in the air, and he pulled back to the east side of the street and drove on; when the defendant struck the woman he was on the wrong side of the line of traffic and after he struck her he increased his speed; I followed him because he ran over the lady and had not stopped; as he drove up Walker there was some travel crossing the street that caused him to have to check up, and that is where I gained on him.

"I sounded my horn, which gave me the right of way to go through; he started to make a left turn on Washington; I was driving in the middle of the street myself and made a left hand turn shorter than he did which caused him to have to go up over the curb or hit me; he ran over the curb and hit a school sign that sets back on the court and says, 'School Zone. 15 Miles per Hour.' He started to back out, but could not; I went down to the car and opened the door and told him he ran over a lady, and he said he did not even know he hit anyone; there was no one in the car with the defendant. He was not

normal, there was something wrong with him, I don't know what it was, he had the appearance of a drunk man; I stayed there where the man had hit the school sign until the officers took charge of him."

The witness was cross-examined at length by counsel for the defendant, but there was no change in his testimony given on direct examination as to what he saw the defendant do.

The state then offered testimony to prove that Mrs. Lambeth was dead; that the accident occurred in the city of Oklahoma City, and other witnesses were called on behalf of the state whose testimony was in substance the same as the testimony set out herein and it is not deemed necessary to set out other testimony at length. The testimony of the witnesses all shows that the defendant was driving on the wrong side of the street at an excessive rate of speed in a school zone at the time he struck the woman, and that he did not stop, but after he got away from the scene of the accident attempted to make a left turn off on Washington street, and the witness Lohner was following him in a truck and forced him up on the parking where he struck a school sign and stopped.

John Williams, the defendant, testifying in his own behalf, in substance stated as follows:

"I am 33 years old; have lived in Oklahoma practically all my life, was born in Stephens county; my business is working on a drill rig; have been engaged in the oil industry since 1919; I have drilled some, dressed tools some, and worked on the drill rig as a helper; my work has been confined to the oil fields since I was 16 years of age; my last work was for the Seibolt Drilling Company, near Crescent, Oklahoma; I was injured while working there; the injury was to my right testicle; the end of an inch rope struck me; this injury incapacitated me for work and confined me to bed; Dr. Hood treated

me; this injury occurred on the 13th day of August, 1936, and I was in bed until the 28th day of August; the injury caused my testicle to swell and give me a world of pain and threw me into a fever. The doctor treated me with ice packs and tablets, then gave me some capsules, I don't know what was in them; I lived about a half block from the doctor's office; I last saw the doctor on the 14th day of September, 1936, I asked his advice as to whether or not I should come to Oklahoma City; I owed some bills and had a compensation check at the Industrial Commission at the Capitol, and wanted to straighten up some bills I owed; I saw him about 7:30 that morning, and he said, 'Go ahead if you can make it, but don't be on your feet too much; if you get to suffering get some amytal and take it'; that was the first time I heard of amytal, I did not know what I had been taking. I came to Oklahoma City and went down to Mr. Newman's Cafe on California avenue; I arrived there about nine o'clock and sat down in the place and begun to suffer; Bill Hensen came in and I asked him if he would get me some amytal, and he went out and bought some, and brought them back and gave them to me; I took two of them at that time; I remained in the cafe for more than an hour.

"I went to Capitol Hill and stopped at the Barnsdall Filling Station, on the corner of Twenty-Fourth and Robinson; called Martin at 3107 South Oklahoma, and asked if Taylor was there, the man that was on the stand a few minutes ago; I went down and picked Taylor up and we came down to the Moss Cafe; we drank a couple of bottles of beer and I taken two of those capsules, chased them with beer; I advised Mr. Taylor of my physical condition; I stayed around Capitol Hill for some time and drove over to a man's house on Twenty-First street that Mr. Taylor claimed owed him some money; we failed to find the man, and, in the afternoon drove down to his sister's house and ate supper and spent the night.

"The next morning I was still suffering great pain; I took some amytal tablets before we went to bed that night; I got up and took some more during the night and still could not sleep soundly; about seven o'clock we went into the kitchen. Mr. Taylor ate breakfast and I took some coffee; I took two amytals; we left Taylor's sister's house the next morning and came back to Capitol Hill; since my injury, about a month prior to this accident I could not sleep but little on account of the pain, nor did I have any appetite.

"We then went to the Moss Cafe and I drank a bottle of beer and I had taken a couple of capsules, this was some time around nine or 9:30 in the morning; I stood around for some time and went down to a pig stand on South Robinson about half a block, after that we came back up in the middle part of Capitol Hill and sat there talking to one another for some time; about 10:45 or 11 I went back in the cafe and drank one bottle of beer and I taken two more tablets.

"I then told Taylor I was going to the Capitol to see if I had a check out there; he said he would stay and see if he found his boss; I did not find anybody at the Capitol; I was suffering and drove back to Capitol Hill. I could not find Taylor, and my batteries were weak and I drove down on California to have them charged and drove into a pig stand and took a capsule, a capsule I found in these papers of the state insurance, the doctor had given me this capsule. I then started to town to get a room and go to bed. I pulled up on the viaduct and some one started cussing me, shaking his finger at me, and I practically did not know anything from then on; I did not remember killing the woman, I have a faint recollection of stopping on Washington, I don't know much about it, do not remember being taken to the police station; I remember something about being examined by the physicians, Dr. Haygood and Dr. Mills; I do not remember what I told the doctors; I only know about drinking four bottles of beer on the 15th, the day of the accident, and they were at different times through the

morning and part of the afternoon; I did not drink any whisky on the 14th or 15th; I did not have any whisky or empty whisky bottles in my car; I have drank whisky but not much.

"I did not purposely or intentionally strike the woman with my car; I was not intoxicated or drunk on intoxicating liquor on the 15th, at the time of the accident.

"I have worked for a number of oil companies, the Carter Oil Company, Sinclair Oil and Gas, Wolverine Oil Company, and a number of contractors; I have never been discharged from the company I was working for; I was driving at the time of the accident a Ford V8, I bought new in July, 1936; the car was in good repair and brakes in good condition; this car would run close to 100 miles an hour; I have no recollection of side-swiping Mr. Lohner's truck nor of driving recklessly or carelessly on that date; I have never been charged with speeding or reckless driving in Oklahoma City.

"I did not know the woman was killed. My injury caused me to walk with my legs apart on account of my right testicle being swollen, to keep from hurting, to a certain extent I walked spraddled out, the pain was practically all through my body, it caused me to be unsteady on my feet.

"The medicine administered to me caused me to have fever. I did not have any fever on the 14th or 15th' day of September, 1936; I would not have taken the amytal tablets had not the doctor prescribed them; I have never taken any morphine or any other narcotic prior to my injury. I do not know where Mr. Hensen who purchased the amytals for me is now. I had a subpoena issued for him but he could not be found."

On cross-examination the defendant stated he was driving a two-door sedan. Handed a picture of the car and asked if it was his car, he answered it was just like his car:

248 

"My car was not in the condition that car is in when I saw it, nor was it in that condition when I got it back; there was no headlight off when the officers turned my car over to me, the headlights were in perfect condition; I do not know who fixed the car, if it had been repaired; I got it back from Judd Black right after I got out of jail; it was turned over to me on October 5th, after the accident on September 15, 1936; I do not know what shape it was in immediately after the accident on September 15; I do not know what I hit, I have a faint recollection of some kind of a noise; I did not tell anyone I was looking back to see what the truck was doing and hit the sign by reason of that fact. I do not know why I started to turn left at Washington street; I don't remember seeing any car from 10th down to Washington following me and honking. My car will make 100 miles an hour, I have had it up to 97; I don't know how fast I was driving nor do I know what side of the street I was on. I don't remember crowding the truck into curb; I do not remember when he started after me nor do I remember swerving to the west side of the street on the wrong side of the road. I never saw the woman at all, I did not see her on my car, nor did I see her going up into the air; I do not remember my car hitting anything, the only thing I have any recollection of is of a noise; I was not drinking or drunk and was not trying to get away on that account; I know nothing about the whisky being in my car; I did not know anyone reached in and turned the engine off; I was not trying to get away or dodge anyone. I had not been in the car with anyone drinking whisky nor had I loaned my car to anyone. When I was in Crescent I kept the car parked in front of the hotel; in my life I have drank some whisky, I never have been drunk. I was never arrested and paid a fine in Seminole for being drunk; I don't remember whether I was finger-printed at the city jail, I don't remember talking to the doctors at the police station. I did not drink any whisky the day of the accident, only drank four bottles of beer. Before I left Crescent the doctor told me if I got to paining worse to get some amytal tablets; I came from Crescent to the

city and reached here about nine o'clock the morning of the 14th."

Several pages of the record are taken up with further cross-examination as to what the doctor said, and what he did before he came to Oklahoma City, and the number of amytal tablets he had taken prior to the accident, which it is not deemed necessary to set out in full.

Several witnesses testified to the defendant's previous good character, as to where they had known him, where he was living, and where he was engaged in oil field work, all testifying they had never known or heard of his having any trouble.

In rebuttal E. L. Cartwright was called and stated he was a school police officer at Riverside and Catholic schools, at Eleventh and South Walker, on the 15th of September, 1936; "it was part of my duty to watch the children come to school"; that he rolled the school signs into the street which said, "School. Slow. 15 Miles an Hour. Stay in Line." He put these signs out at 8 a. m., and took them down at 9:05; then put them out at 11 and took them down at 1:05 p. m.; he put them out at 3 and took them down at 4:15. These signs have a metal base with a rod attached to the bottom so they can be set in the street.

"I was on duty the day of this accident. I get away after one o'clock for an hour for lunch. We took these signs out of the middle of the street at 1:05 p. m., and put them back on the parking; there was no sign in the middle of the street at 2 o'clock the day of the accident, I put the sign back out at 3 o'clock in the afternoon."

The defendant, John Williams, was recalled and stated he never paid a fine of $19 in Seminole, Okla.

The foregoing is in substance the testimony of the state and the defendant.

The defendant for grounds for reversal of his case has assigned 15 errors alleged to have been committed by the court in the trial. The first proposition argued by the defendant is, "The verdict and sentence is not sustained by the evidence."

The defendant, in arguing his first proposition, has at length set out the testimony taken in the trial of his case, and states in his brief that he deems it advisable to do so in order to have before the court the facts as testified to by the witnesses. The defendant earnestly insists in his brief that the evidence in this case is not sufficient to sustain the judgment. The defendant was tried on a charge of murder growing out of the facts as alleged by the state that he was drunk, driving a car upon South Walker street in Oklahoma City, Okla., and that by reason of that fact under the laws of Oklahoma he was committing a felony, and while driving at an excessive rate of speed, and while intoxicated, he struck Mrs. Lambeth and killed her.

It is not denied by the defendant that he was the driver of the car that struck Mrs. Lambeth, from the force of which she died, nor is it denied he failed to stop when his car struck her, but that he drove on down the street and sought to make a turn on Washington street when one of the witnesses, Mr. Lohner, cut the center of the street in his truck and forced the defendant's car on the curb, where it struck a school sign and stopped. The defendant denied he had drunk any whisky, or anything that was intoxicating; he admits he drank four bottles of 3.2 beer that morning before the accident, and

up to the time he started up Walker. His main defense is that he had received an injury to one of his testicles about a month prior to the date of the accident and his doctor prescribed amytal tablets for him, and he claims that before the accident he was in great pain from his injury and that he had taken several of these amytal tablets, and became very stupid and his mind beclouded to such an extent that he did not recollect what he did, and that he did not know he had struck a woman until advised of it after he was placed under arrest. The defendant also offered testimony by reputable witnesses showing his previous good character, and the doctor testified that the defendant had been injured and that he prescribed amytal tablets for defendant to take.

We cannot agree with the defendant in his argument that the verdict of the jury is not supported by the evidence and is contrary to the law. The testimony of the state's witnesses shows that the defendant had the odor of whisky on his breath, and a bottle was taken from his car which had the odor of whisky in it, and at the time he struck the woman he was driving at an excessive speed in a school zone which limits the speed to 15 miles an hour. The only testimony to the contrary is the testimony of the defendant. He admits that at the time he struck the woman and up until he was being examined by the doctors or some of the officers he had no recollection as to what had taken place along Walker street where he had driven. It is evident, from the verdict returned by the jury, the jury did not believe the defendant was testifying to the truth, and by its verdict harmonized the conflict between the state's witnesses and the defendant and decided against the defendant, and returned its verdict of guilty of murder, imposing life imprison-

ment, the minimum punishment that can be imposed upon a defendant when convicted of murder.

The question of the sufficiency of the evidence has been before this court many times, and the court has universally held that where there is any competent evidence which reasonably sustains the verdict and judgment, a conviction will not be reversed although the evidence may be conflicting or different inferences may be drawn from it.

Section 3206, O. S. 1931, 22 Okla. St. Ann. § 1068, is as follows:

"No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

All the evidence, and the circumstances surrounding the actions of the defendant, clearly show an utter disregard for human life, and further show that he was maudlin drunk and unable to or did not try to control his car or respect the rights of others on the streets of Oklahoma City; that he was driving in a fast and reckless manner endangering the lives of others.

In Tillery v. State, 23 Okla. Cr. 226, 214 Pac. 198, in the second paragraph of the syllabus, this court stated:

"When the sufficiency of the evidence is challenged, and the evidence as a whole does not satisfactorily or conclusively convince the appellate court of the guilt of the accused, the verdict will not be set aside on the ground

of the insufficiency of the evidence, where, as in this case, there is some substantial evidence tending to support the verdict. The weight of the testimony and the credibility of the witnesses is for the jury." Taylor v. State, 21 Okla. Cr. 351, 207 Pac. 746.

The jury is the exclusive judge of the weight of the evidence, and if there is a conflict in the evidence or the evidence is such that different inferences can properly be drawn from it this determination will not be interfered with unless it is clearly against the weight of the evidence, or it appears to have been influenced by passion or prejudice. Choate v. State, 37 Okla. Cr. 314, 258 Pac. 360; Clemmer v. State, 56 Okla. Cr. 354, 40 P. 2d 37; Holford v. State, 57 Okla. Cr. 431, 48 P. 2d 1082; A. G. Goodnight v. State, 62 Okla. Cr. 382, 71 Pac. 2d 789; and John Coppage v. State, 62 Okla. Cr. 325, 71 P. 2d 509.

There is nothing in the record to show that the verdict of the jury is against the weight of the evidence nor does the record show that the jury was influenced by passion or prejudice. After a careful study and examination of the entire record we hold the evidence is sufficient to sustain the judgment.

The next proposition that it is deemed necessary to consider is the 12th assignment of error:

"That the court erred in failing to instruct the jury upon the theory advanced by the plaintiff in error in his said defense, all of which was prejudicial to the rights of the plaintiff in error."

An examination of the record shows that the defendant offered 6 special instructions, all of which were refused by the trial court, and the defendant saved an exception. An examination of these requested instructions show that neither of them correctly stated a propo-

sition of law as applied to the facts before the court, and that the refusal of the court to give the instructions requested was not error.

The question then is, the defendant having invited the attention of the court to the theory of his defense and requested certain instructions along the line of his defense, did the court in his general instructions correctly and sufficiently instruct the jury upon the theory of the defendant's defense, that is, that he was under the influence of amytal tablets and did not know what was going on and could not remember having had an accident and striking the woman who was killed. The court in its general instructions gave to the jury instruction No. 14, which is as follows:

"You are instructed that all persons are presumed to be of sound mind until the contrary is shown, and all persons are capable of committing crime except insane persons or persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them were incapable of knowing its wrongfulness, and in that regard, if you find from all the evidence in this case that the defendant was temporarily or partially deprived of reason and was therefore rendered incapable of knowing the wrongfulness of any of the material elements of the offense charged, or of any of the included offenses, or if you entertain a reasonable doubt thereof, you must give the defendant the benefit of the doubt and acquit him."

After carefully considering the instructions given by the court on its own motion, it is shown that they are the usual instructions given in cases where the defendant is charged with murder, and they correctly state the law applicable to the facts in this case, and are as favorable to the defendant as the evidence in the case will warrant.

It is not error for the court to refuse requested instructions if the law covered by the requested instructions is fully and fairly covered by the court's general instructions. Hamilton v. State, 38 Okla. Cr. 62, 259 Pac. 168; Wheat v. State, 38 Okla. Cr. 119, 259 Pac. 279.

The defendant complains of other errors committed by the trial court. An examination of the record discloses that the other errors complained of are without sufficient merit to require a separate discussion in this opinion. The facts in this case show that the defendant willfully, carelessly and negligently, while under the influence of intoxicating liquor, drove his car at an excessive rate of speed within a school zone upon South Walker street, in the city of Oklahoma City, disregarding the right of the public and with a depraved mind. His action endangered not only the life of the woman killed, but all others that might be upon the street at the time, and showed that the defendant wholly disregarded and violated every principle of the rules of the road and the laws of our state, and in doing so he committed willful murder. The jury was lenient with the defendant and returned its verdict of guilty of murder but imposed the lightest punishment that could be inflicted upon the defendant when convicted of murder.

The defendant was accorded a fair and impartial trial. The instructions of the court substantially covered all the issues raised in the trial of the case. The evidence is sufficient to sustain the conviction. Finding no errors in the record warranting a reversal, the judgment of the trial court is affirmed.

DOYLE and BAREFOOT, JJ., concur.