ERNIE FREEMAN v. STATE.

No. A-9631.     March 28, 1940.
(101 P. 2d 653.)

Utterback & Utterback and R. T. Stinson, all of Durant, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Bill Steger, Co. Atty., and Ben Carter, Former Co. Atty., both of Durant, for the State.

BAREFOOT, J.  The defendant, Ernie Freeman, was charged in Bryan county with the crime of murder; was tried, convicted of manslaughter in the second degree, and sentenced to serve a term of two years in the penitentiary, and has appealed.

The charge against this defendant was by reason of the killing of R. F. Choate, upon the streets of the town of Caddo, Bryan county, on the 8th day of October, 1937, and while defendant was driving an automobile upon said streets.

Among the assignments of error presented is that the verdict of the jury is contrary to the law and the evidence.  As to when this court will set aside the verdict of the jury in a case involving the sufficiency of the evidence to sustain the same has often been passed upon by this court.  In one of the most recent cases, that of Sentell v. State, 61 Okla. Cr. 229, 67 P. 2d 466, 469, that rule has again been announced, as follows:

"It is well-settled law in this state that if there is evidence to support the conviction this court will not weigh the sufficiency of the same to support the verdict. It is, however, equally well settled law in this state that this court will consider all the evidence to ascertain whether a verdict is in fact founded upon sufficient evidence to warrant a conviction.

"If the evidence introduced by the state fails to incriminate the defendant, or as a matter of law is insufficient to show that the defendant is guilty of the offense charged, it is not only the right but the duty of the trial court to advise the jury to return a verdict of acquittal. Procedure Criminal, section 3090 (22 Okla. St. Ann. § 850)."

With this well-established rule in mind, a review of the evidence in this case is necessary.

As a matter of convenience a part of the evidence of the defendant will be considered first.

The defendant, Ernie Freeman, was 31 years of age; married, and the father of three children. With the exception of three years that he resided in Texas he had lived in the vicinity of Caddo, Bryan county. He was engaged in farming on a small scale. In his early years he had been sick, and as a result thereof had had trouble with his lungs and heart. He had been under the treatment of a doctor upon numerous occasions.

The first witness for defendant was his wife, Mrs. Ernie Freeman. She testified that she and defendant had been married 11 years; that they lived three miles west of Tuska, in Bryan county, on a farm; that on Friday, October 8, 1937, her husband had been sick and had been lying down a part of the day; that he told her he was going to Caddo to see the doctor and to get some medicine; that she tried to get him not to start until she could get her work done and get the children ready so she could go with him; that about 5:15 p. m., he left to go to Caddo by himself. She thought he had a chill during the day. He was nervous and high-strung. She testified he was subject to these attacks, and had had them for many years. She testified to several occasions when he became delirious, and especially at one time when they were in a car going to Turner Falls about 30 days prior to October 8, 1937. He had to get out of the car and rest. She did not know the defendant had injured anyone until her mother came to her home on the following Saturday and told her.

Mrs. Bruce G. McGraw testified that she had known defendant and his wife for about five years. She recalled she and her husband being at the home of defendant and defendant becoming sick while they were eating supper,

and that his face was flushed, "and he was jerking all over and didn't seem to know much about what he was doing, and we taken him to the doctor."

Wiley A. Cariker testified that he lived at Armstrong and had known the defendant all of his life. He was in business at Armstrong. He recalled an instance when the defendant came to his place of business about dark. He went out to the car and saw defendant, who told him he was sick, "and thought he would rest a little while". He laid down on a bench for a short while, and finally said, "I think I feel well enough to go on to Caddo". He further testified:

"Q. Did you notice anything out of the ordinary in his appearance? A. No, sir, I did not. My first impression was that he was drunk, but he wasn't. He did not act like it. Q. He acted like a sick man? A. Yes, sir; he did. He said he was sick and acted like it."

Dr. R. P. Dickey, who had practiced medicine for 34 years, and who lived in Caddo, Bryan county, testified he had known the defendant for a number of years, and during that time had treated him on numerous occasions. He had treated him for "hemorrhage of the lung", and "nervous heart trouble." These treatments were two or three years prior to the 8th of October, 1937, but he had had occasion to see him after that time. He further testified:

"Q. Doctor, had you learned how he was affected mentally by either or all of these troubles? A. When he had fever he was very delirious. Q. Was that habitual? A. It was when he had hemorrhages of the lung, and he was delirious when he would have fever at all. Q. Will you state to the jury just how two or three degrees of temperature or what we ordinarily call moderate fever or high degrees of fever, how it would affect him? A. He was delirious when he had fever from 101 to 102, and

was very nervous and would see things about over the house and in fact, when he had much fever he was a nervous wreck."

The doctor was asked hypothetical questions describing the conduct of the defendant prior to the accident involved in this case, and stated that in his opinion it would make him very nervous and he would not know what he was doing and that "he would be about like a drunk man was or a man incapable of taking care of himself."

He further testified:

"Q. And when he was mentally in what you call a nervous wreck, how would that affect him as to his being easily excited? A. He has always been easily excited, that has been my experience with him. If he is excited very much he would not have much sense. He would be almost mentally incapable of doing anything. Q. Doctor, if on the day, October 8, 1937, Ernie Freeman had a chill followed by fever and while he was in that condition he would back his car and hang the bumper of his car on the other car and make considerable noise, what affect in your opinion, would that have upon his mental capacity, if at that time he was suffering with this fever? A. My opinion would be that it would make him very nervous and he would not know what he would do."

He further testified as follows:

"Q. With any of these troubles that you have indicated, would there be any evidence of a flushed face? A. Yes, his face was usually flushed. His face was usually flushed when he had fever and was nervous and his heart troubled him."

He further testified as follows:

"Q. When a man is rational or irrational from the effects of fever, tell whether or not the patient when he is irrational, will make statements that you know are not from a rational mind, and maybe the next minute or two he is perfectly rational, could there be a continued con-

dition? A. Ordinarily it is not a continued condition. He might be rational for a little while and talk about some things foolish the next. He could talk or think about some things and be rational and after that was over with, he would be irrational."

He further testified that he was out of the town of Caddo on the evening of October 8, 1937. That the defendant came to his home on the morning of the 9th of October, and he took him to Armstrong and turned him over to the officers from Durant. He did not make an examination of him, but he was "nervous, sick and crying", and told him he did not want the officers to come after him, and asked him to take him in.

Alfred Jackson testified he was the father-in-law of defendant. That defendant and his brother, Pearly Freeman, came to his home about five and a half miles northwest of Caddo some time between 9 and 10 o'clock, on the night of October 8, 1937. That his brother came in and asked if Dr. Dickey was there; that he lived on Dr. Dickey's place; that he asked who was sick, and Pearly Freeman told him Ernie Freeman, the defendant, was sick; that he wanted to see the doctor. The defendant told him that he had hurt someone down at Caddo, and wanted to go to Durant and give up, and was anxious to get word to his wife of his whereabouts so she would not be worried about him. That a cloud was coming up and it was sprinkling rain, and the roads were bad to Durant and they were likely to get stuck. He persuaded defendant to get out and stay all night at his home, which he did. He testified defendant was excited and he heard him up during the night, but could not tell whether anything was the matter with him. This witness testified he did not think defendant was rational, but that he was not out of his head. He was very fair in his testimony.

Pearly Freeman testified he was the brother of defendant. That he lived three miles south of Caddo. That on the night of October 8, 1937, about 8 or 8:30 o'clock his brother came to his father's home; that his face was flushed and he seemed to be sick; that defendant told him that he had been sick all day, and thought that he had run over somebody at Caddo. He advised him to go to Durant and give up, and they started to Durant. The defendant wanted to see a doctor and wanted to get word to his wife so she would not worry. When they got to the highway the defendant told him Dr. Dickey was out at his farm and they went to the home of his father-in-law, Mr. Jackson. It was dark and cloudy and sprinkling rain, and his brother, the defendant, stayed there and he went home. He testified that the defendant had had spells for many years; that they seemed to be caused from his head and his heart.

The evidence of the state to sustain the allegations of the information was as follows:

Frank Powell was an undertaker at Durant and he went to Caddo to get the body of R. F. Choate.

Dr. W. K. Hanie testified to the death of R. F. Choate on the 10th day of October, 1937, as a result of injuries received on October 8, 1937.

Joe Turner was a barber at Caddo. He saw defendant about the time he closed his shop. He drove past his shop and parked in front of Mr. Meadow's store. He got out and went in the store and stayed a few minutes and came out and got in his car and backed out. In doing so his car struck another car that was parked beside it. He saw him back out again and go east to the intersection and turn and come back west to the place where he struck the car in backing out. Someone holloed

at him and he stopped and said: "If he had done any damage he had the money to pay for it." He heard somebody say, "No, you didn't do any damage to speak of." He then went on west on the public street which was known as Buffalo street. He did not know how fast he was going but imagined 30 miles an hour. This was about 6:15 p. m.

Hugh Huddleston testified he had a garage and filling station at Caddo. He saw defendant when he came out of the Meadows Grocery Store. He was about 30 or 40 feet from him. He saw him back out and strike the bumper of Joe Brown's car. He drove east to the intersection and came back going west and stopped and talked to Joe Brown. He said to him, "What you say?", and Mr. Brown replied, "You did not do any damage, you bent the bumper a little", and he said, "If I done any damage I got the God-damn money to pay for it." He then drove west up Buffalo street, which has a little incline. When asked how fast he was driving, he said, "I couldn't tell exactly, 40 or 45 miles an hour."

Mr. H. I. Meadows testified he was in the grocery business in Caddo. That the defendant came to his place of business on the evening of October 8, 1937, "just after sundown, about dusk." That he walked to the back of the store and asked him if he had some flour, and he asked him if he wanted a sack, and defendant said, "Not just now, I may be back after while." That he talked to him for a few minutes, and defendant walked out and got in his car, and "sat in the car for a half or three quarters of a minute." That he did not see him back out, "but he rubbed another car there." That when he did this he came back in and parked at the same place for a minute and then backed out. He heard him ask Mr. Brown if he had done any damage to his car. On cross-examina-

tion he stated, "The only thing I noticed unusual about him was his face was a little flushed."

Charley Harmon lived in Caddo and was standing in the front door of the City Hall, which is across the street north from Hugh Huddleston's garage. He saw defendant back out and strike the rear fender or bumper of Joe Brown's car. He saw him drive up to the intersection and then turn and come back and ask if he had done any damage, and if so he would pay for it. He had plenty of money. He observed him as he drove on west, and saw him pass another car, and he thought he was going to run into it, "but he turned and run nearly across the street and straightened it and went on." He testified he was going fast.

Joe Brown heard the noise when defendant backed into his car. He saw him go back to where he was parked, and then back out and go down the street east to the intersection and as he came back west, he holloed at him and he stopped and said: "What damage have I done, I got plenty of dam money to pay for it," and that he told him there wasn't any damage, and he drove on. He further testified:

"Q. Did you observe him as far as you could see him down west? A. I quit looking after he got about a block. Q. How fast was he going? A. Something like 40 miles an hour."

On cross-examination he said, "How fast he was going is just a guess."

The next witness for the state was J. N. Choate. He was the brother of deceased, and was 65 years of age. His brother was 69. He lived in Arkansas, and on the 8th day of October, 1937, was visiting his brother at his home in Caddo. Just about dark they had been down to the shop where his brother worked and were returning home.

174

They were going west on the south side of the street, and in front of Mr. Brauderick's house they started to turn north and go across the street. They had passed the street intersection about ten feet. He saw a car coming from the east. He testified:

"Q. How far away was that car when you first saw it? A. I couldn't say how far, it was a right smart little ways. Q. In feet, could you estimate it? A. It was 100 feet or more. Q. Could you tell whether the car was coming fast or slow? A. It was coming fast. Q. Did you say anything to your brother, or he to you? A. Yes, sir, I stopped when I saw the car coming and said to him, 'I don't believe we can make it' and I stepped back and he said to me, 'We are going to have to hurry.' Q. You went to the back toward the south side of the street? A. Yes, sir. Q. Was there a street light there? A. Yes, sir. Q. Was it burning at the time? A. Yes, sir. Q. How near to the north side of the street did your brother get when he was struck? A. You might say he was ready to go off of the pavement. Q. You mean the gravel? A. Yes, sir. Q. Where were you when he was struck? A. I was back there close to the south side of the street. Q. What effect did the car striking your brother have—did it throw him any distance? A. Yes, sir. Q. Tell what happened? A. It carried him a right smart little piece. Of course, I couldn't see anything. I reckon he threw his brakes on about the time he hit him. It made such a dust I couldn't see my brother after he crossed the street. Q. What did the car do them? A. It went out a little ways and turned around and backed into another car. Q. What did the car do after it struck your brother? A. It went and turned around and backed into this other car, then the lights were towards me and my brother. I had got to my brother and he whipped around us. Q. Which side did he go around? A. North side and he turned back angling across the street. Q. Which direction? A. South and hit that street running south. Q. Did you ever see the person in the car? A. I saw him, but that was all. I didn't know him."

On cross-examination he stated:

"Q. Tell the court and jury if it isn't a fact that you and your brother had progressed west across this north and south street—half on across the west of the culvert and on the side of it and turned angling across bringing you out over there about the door of the Brauderick house, or near this entrance that went in—the driveway? A. We wasn't angling much. Q. You were going across west of the street and west of the culvert? A. Yes, sir."

He further testified:

"Q. You are sure the light was burning? A. (No answer). Q. Don't you remember immediately after that, someone commented near the body of your brother, that the light wasn't burning? A. No, sir. Q. Was your brother deaf, Mr. Choate? A. No, sir. Q. His hearing was alright? A. Yes, sir. Q. He had lived in that block for a long time? A. Yes, sir, he had been living there."

He further testified:

"Q. When you crossed over this north and south street, did you get to the west side of the north and south street before you started north? A. Yes, sir. Q. Did you go past this north and south street before you started north? A. Yes, sir. Q. How far past the north and south street did you get before you started going north? A. Just a little ways. Q. How far—ten feet, five feet, or ten feet or what? A. Ten feet. We crossed a little bridge there. Q. Which way did that bridge run east or west? A. North and south. Q. When you had crossed over this north and south street and had gone about ten feet, you then started north to the north side of the Brauderick house? A. Yes, sir."

The next witness for the state was Madrey Barker. He testified he was 22 years of age. That on the evening of October 8, 1937, he was at the home of Bill Smith, who lived on the southeast corner from the John Brauderick home, and on Buffalo street. He was sitting in the

front room of the Smith home, and the first thing that attracted his attention, "I heard a dull thump when it hit Mr. Choate." He saw the car of defendant on the south side of the street in the bar ditch and saw defendant back up and then turn around and head back toward Mr. Choate and stop. He heard Mr. Oscar Nail holloa that he had killed a man. The defendant immediately backed his car out, and in doing so struck an automobile that was headed east. He then turned at the corner and went south. He recognized the defendant, Ernie Freeman, as being the driver of the car. The defendant did not say anything and did not get out of the car. He did not remember whether the street light was burning or not.

John Brauderick testified that he was at his home on the evening of the 8th of October, 1937. He was standing on the porch and Mr. Oscar Nail was with him. When asked what first attracted his attention he replied:

"A. I happened to be looking that way and seen these two men coming across the street and didn't know who it was at the time and I saw the car and about that time the fellow ran into them. Q. How long before the man was hit, had you observed the car? A. You mean I saw it? Q. Yes, sir. A. It couldn't have been very long. Not over a few minutes. He was coming pretty fast. Q. How fast? A. Thirty-five or forty mlies an hour, the best I could tell. Q. Was any noise made when he struck this man? A. Yes, sir, there was quite a bit of noise. The brakes squeaked. Q. Did you hear the brakes squeak before the lick? A. Right shortly before he hit him. Q. How far did it knock the man that was hit? A. That is hard to tell. I stepped it the best I noticed. It was twenty steps from where he hit him to where we found him. Q. After the man was hit, what did the car do then? A. It zig-zagged around off of the road and tried to turn over and he finally brought it to a stop on the

south side of the street. The left hand side of the street. Q. Did he stop at the street edge or the property line of the south side? A. The rear casing was settling on the edge of the gravel, the best I could remember. Q. You stepped the distance from where the man was hit to where the car stopped? A. Yes, sir, between ninety and ninety-five, the best I could tell. Q. Where was Mr. Choate, with respect to the street, at the time he was hit? A. Well, it looked to me like he was trying to get across the street. Just one more step would have got him across. Q. What do you mean, 'The street?' A. Where you go across to get on the other side. Q. What do you mean by step—three feet? A. Yes, sir, something like that. Q. Where was the body when you found it? A. It was laying on the right hand side of the street. Q. You mean the north side? A. Yes, sir. Q. In the street? A. The best I could tell it was right at the edge of the gravel."

His evidence with reference to the actions and conduct of the defendant after the accident was substantially the same as the other witnesses.

On cross-examination he stated:

"Q. John, watch this. (Indicating) This car coming west that night, tell if it didn't cross that culvert as near as it could without getting in the ditch? A. It absolutely did. Q. Tell the court and jury if it isn't a fact that as these two men came along, if it isn't a fact one stopped and one stepped out in front of the car? A. It seems that one stepped back and the other started across. Q. And jumped out in front of that car? A. I don't know about jumping in front, but he made an attempt to go across. Q. Didn't the man driving the car put on the brakes before he hit the man? A. Just as he hit him. Q. You realize that the brakes were put on before he hit him? A. Just about the time it hit. That is the best I could tell you. Q. After he had hit him there from the top of the culvert, where he was hit, the car traveled about 90 feet? A. Yes, sir."

Mrs. H. I. Meadows lived in Caddo, and on the evening of the 8th of October, 1937, she was on the south side of Buffalo street, and had crossed from the north to the south side. She saw the car just as it struck Mr. Choate. Her evidence as to the acts of the defendant after the accident corroborated that of the other witnesses before stated. On cross-examination she testified that the car struck him "west of the culvert and south of the Brauderick house. She did not remember whether the streetlight was burning or not.

Oscar Nail was at John Brauderick's home. His evidence was just about the same as that of the witness John Brauderick. He was asked:

"Q. What attracted your attention to it? A. I heard the noise and it sounded like the brakes were setting."

The defendant's lights were burning. The defendant stopped and when he told him, "My God, you have killed a man," he went on. He testified that the street light was not burning at the time.

O. E. Staggs testified that on the evening of October 8, 1937, he was driving on the streets of Caddo. That he started to drive past where there had been an accident and started to stop and a car backed out and hit his car The car went on south. This was the car of defendant

Cleve Dameron testified that he lived three miles southeast of Caddo; that on the evening of the 8th of October, 1937, he was going to Caddo. He was driving a team and wagon. He met a car coming down the road; the defendant was in the car and it struck the wagon of the witness. He stopped and he asked him, "How come you to run into me?" Defendant did not answer him, and he asked him three or four times. Defendant then asked him, "Where am I?", and he told him where he

was, and told him he had broken his neck-yoke, and defendant handed him a dollar and told him that was all he had, and defendant then left. On cross-examination he stated he had known defendant three or four years, and he was asked:

"Q. Was that usually the ordinary way that Ernie Freeman talked to you? A. No, sir."

Lee Smith testified he was a deputy sheriff, and that he and the sheriff of Bryan county, Mr. John Williams, went to the home of B. O. Freeman in October, 1937, but did not find the defendant. He saw his car and the left light was broken entirely off, and the right lens was out and bent up.

On rebuttal Tom Tabor, for the state, testified he was the night jailor, and that he did not have any recollection of defendant calling him on either the night of October 10th or 11th, and telling him that he wanted a doctor.

The defendant, testifying in his own behalf, corroborated the testimony of other witnesses in many respects, and it is unnecessary to repeat that part of his testimony. He stated that he had been sick and had spells with his head and heart, and had chills and fever, and at times became delirious, and gave specific instances that while driving his car it became necessary for him to stop and rest. He also testified that he had lived three years in Texas, and that while there he had been charged with the crime of embezzlement, and had pleaded guilty to the charge and was given a two-year suspended sentence by the jury. He was sick on October 8, 1937, and late in the evening of that day went to Caddo for the purpose of seeing Dr. Dickey and getting some medicine. He was told that Dr. Dickey was not in Caddo, but had gone out

to his ranch. His testimony with reference to going to the Meadows Grocery, was about the same as that given by the disinterested witnesses, as heretofore related. With reference to the occurrence of the collision, he stated that he did not know the rate of speed he was traveling at the time. He thought it was 20 or 25 miles an hour. It could have been greater. He said when he came to near the corner he saw a man on the south side of the street. He put on his brakes and the party went back to the south side. About that time his car struck something. He did not know what it was, and did not see the deceased, R. F. Choate. That he stopped his car as soon as he could and turned around and came back. His evidence was:

"A. I judge I was driving 20 miles an hour. Maybe 25. I could have been driving faster, I don't know. I was driving along there and it was between dusk and dark and at that time of the night it seems like it is hard to see anything or anyone, but I noticed a man on the left hand side and he started out and he backed up and I kept pulling to the right and about that time I hit something and stepped on my brakes and when I got stopped I was over to the left. Q. Tell where you were on the street when you first noticed this man on the left. A. I was probably, I will say 15 feet from him. Q. You were about which direction? A. He was west of me and south. Q. And you were back east? A. Yes, sir. Q. Before you reached that part of the highway, you saw this man on the left? A. The first thing I thought of was to stop and I put on my brakes and he stepped back and I probably got off of my brakes and heard something that I had hit and I put on my brakes again. Q. Did you stop your car as quickly as you could after you knew that you had hit something? A. Yes, sir. Q. Didn't you know that you had hit a man? A. No, sir. Q. How far did the car travel after you realized you were stopped? A. I figured it was about 25 or 30 yards. Q. From 75 to 90 feet? A. Yes, sir. Q. When you stopped what did you do? A. I backed up and drove back to where the men were stand-

ing. Q. Explain when you backed up how you backed your car,—just how you backed up? A. The best I can remember, I cut to the right and backed up west. Q. From there when you backed up a piece, where did you drive it? A. I drove back to the scene where two men were standing. Q. Were your lights burning? A. They should have been. Q. Were they burning? A. Yes, sir. Q. Did you see these men out there in the road? A. I saw two men standing there. Q. And you drove up there? A. Yes, sir. Q. Tell the court and jury what was said by them, or you? A. As I came back some man hollered, 'Hey', he had a very coarse voice and a shrill voice and I drove up there and one of these men said, 'My God man did you know that you have killed a man.' Q. Did you know that man? A. No, sir. Q. What did you do then? A. I don't know what I did. Q. Why don't you know? A. I don't know. I guess I was shocked so by being sick, I didn't know what was wrong or where it was or anything. Q. What were you doing the next time that you know what you did? A. I was out there, I guess about a mile and a half south of Caddo. Q. What happened there? A. I hit Cleve Dameron's wagon. Q. Do you know what happened there when you hit his wagon? A. Nothing more, he came running around there—I guess it was him— Q. Tell what happened? A. He asked me what was wrong with me and I don't know what I said, and in a minute I kinda come to my senses and he asked me two or three times and I said, "What happened Cleve, where am I at?', and he said, 'You run into my wagon', and I said, 'Did I hurt anything?', and he said, 'No, didn't hurt anything but I believe you did break the neck-yoke', and I asked him what it cost and he said a dollar or something like that and I paid him. Q. Where did you go from there? A. To my father, a mile and a half down the road. Q. This was on the road to your father's? A. Yes, sir."

The defendant walked from his father-in-law's, Mr. Jackson's, to Caddo on Saturday morning and got Dr. Dickey to telephone the officers at Durant to meet them

at Armstrong and take charge of defendant. He was placed in jail and the charge of murder was filed against him.

While we have not given the evidence in full, we have given the substance thereof, in order that it may be discussed as we see the law in this case as applied thereto. In the first place, there is not a line of evidence that defendant was under the influence of liquor at the time this accident occurred, or that he at any time had touched the same in any way, or that he was under the influence of any drug or narcotic.

The evidence at the time the accident occurred is not sufficient, as we view the same, to sustain the verdict rendered in this case. Three instructions given by the court, directing the jury to return a verdict of not guilty if they found the facts to be as stated by the court, were completely ignored by the jury, because had they followed the law given in these instructions and as applied to the facts, they would have been bound to return a verdict of not guilty. What were the facts as shown by the witnesses for the state? J. N. Choate, the brother of deceased, was attempting to cross the street in the residential section of the town of Caddo, between dusk and dark, with his brother who was killed. He saw a car approaching from the east which he estimated was 100 feet distance. He warned his brother that they could not make it, and his brother said that "We will have to hurry." He did not attempt to go across, but stayed where he was. His brother attempted to go across. He was at least ten feet below the street intersection. At the time he was struck he had completed the distance across the street of at least 25 or 30 feet. If the automobile driven by defendant was only going 25 to 30 miles per hour it would have had time to travel the distance of 100 feet

before it struck the defendant. This witness could not testify how fast the car was going when he first saw it, nor when it struck the deceased. The other witnesses for the state who saw the accident could not testify how fast the automobile of defendant was traveling at the time it struck deceased. Any statement they made would, as they stated, be only a guess. Some of the witnesses for the state testified the street light was burning, others testified that it was not. No witness could testify to any act of negligence on the part of the defendant, and certainly there was no evidence of "culpable negligence." And no evidence that warranted a jury in finding beyond a reasonable doubt that defendant was guilty, even of manslaughter in the second degree. It is doubtful if it was sufficient to have found a verdict against the defendant in a civil case for damages, which only requires the finding by a preponderance of the evidence.

This court, in defining the term "culpable negligence," in construing the statute upon manslaughter in the second degree, has been much more reasonable than have the courts of many other states. Oklahoma Statutes 1931, § 2228, 21 Okla. St. Ann. § 716. In the case of Philby v. State, 64 Okla. Cr. 1, 76 P. 2d 412, this court, in an opinion by Judge Doyle, says:

"Culpable negligence is the omission to do something which a reasonable and prudent person would do, or the want of the usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions."

Similar definitions of the term have been given in the cases of Kent v. State, 8 Okla. Cr. 188, 126 P. 1040; Nail v. State, 33 Okla. Cr. 100, 242 P. 270. See, also, the following cases: Clark v. State, 27 Okla. Cr. 11, 224 P. 738; Williams v. State, 63 Okla. Cr. 234, 74 P. 2d 632; Clark v. State, 63 Okla. Cr. 138, 73 P. 2d 481. In the

Nail Case Judge Edwards discussed this question very fully, and although that case was affirmed, the court said [33 Okla. Cr. 100, 242 P. 272]:

"By no means every instance where one person is injured or killed by a vehicle driven by another do the circumstances constitute a crime. There must be negligence rising to the degree of criminal or culpable negligence. The culpability of a defendant is a question of fact for the jury, and the test is: Do the acts charged as criminal show a degree of carelessness amounting to a culpable disregard of the rights and safety of others, and did said acts cause the death of deceased? If so, it establishes a case of criminal negligence. * * *

"The highways of the state are common property of all, and by whatever method or conveyance they are used for travel, persons upon the highways have equal rights. In exercising these rights, each must have regard for the rights of others. The law gives the right to use the highways for travel by automobile, but this right is limited to doing so in a legal and prudent manner, and when a person drives upon the highway in the exercise of such right in a negligent manner, so that his negligence affects others likewise lawfully upon the highway to their injury, he becomes liable to the injured party, and, if the degree of negligence with which the act is done is culpable within the meaning of the law, he becomes liable to the state for criminal negligence."

It will be noted that in most all of the cases above cited, there was evidence of the defendant either being under the influence of intoxicating liquor at the time of the accident or having had the use or possession of the same. It will be further noted that the facts in those cases are much stronger than in the instant case. Applying the rule or definition given to the facts in the case at bar, what can it be said that defendant did that an ordinary, reasonable, or prudent person would not have done under the circumstances, or what did he fail to do

that an ordinary, reasonable, or prudent person would have done under the circumstances? No witness for the state testified that he saw the deceased. He stated that he did not do so; that the first he knew deceased was there was when his car struck him. He saw his brother on the south side of the street and saw that he did not attempt to cross the street. The deceased was not crossing the street at the intersection, but from the state's own evidence, was from 10 to 25 feet west of the intersection. There was no evidence that he was violating any speed law, or that he was driving at an unreasonable rate of speed. There was a conflict in the testimony as to whether or not the street light was burning. It just does not occur to us that, under the facts as presented in this case, the court should have permitted the same to go to the jury, and especially the court should not have submitted the issue of murder, giving the jury an opportunity to compromise by finding defendant guilty of a lower crime when there was absolutely no evidence to sustain the murder charge.

Many cases from other states have defined the term "culpable negligence" in stronger terms than have the Oklahoma cases above cited. Turner v. State, 183 Miss. 658, 183 So. 522; People v. Hoffman, 162 Misc. 677, 294 N.Y.S. 444; Cain v. State, 55 Ga. App. 376, 190 S.E. 371; Shows v. State, 175 Miss. 604, 168 So. 862; State v. Cope, 204 N.C. 28, 167 S.E. 456; State v. Carter, 342 Mo. 439, 116 S.W.2d 21; State v. Bates, 65 S.D. 105, 271 N.W. 765; Franklin v. State, 120 Fla. 686, 163 So. 55; State v. Lancaster, 208 N.C. 349, 180 S.E. 577.

In the case of People v. Hoffman, the court said [162 Misc. 677, 294 N.Y.S. 446]:

"The leading case in this state is People v. Angelo, 246 N.Y. 451, 159 N.E. 394, because it clarified the mean-

ing of the words 'culpable negligence.' That case traced their history from the common law to the present time. The defendant in that case had been convicted of manslaughter in the second degree for negligently operating an automobile which was in a collision with another automobile and the passenger in one being killed. The Appellate Division (219 App. Div. 646, 221 N.Y.S. 47) reversed the conviction because of erroneous instructions given to the jury as to the meaning of 'culpable negligence.' The Court of Appeals affirmed the order of reversal. After tracing the history of legislation and judicial interpretation, Judge Andrews stated, 246 N.Y. 451, at page 457, 159 N.E. 394, 396:

" ' "Culpable" negligence is therefore something more than the slight negligence necessary to support a civil action for damages. It means, disregard of the consequences which may ensue from the act, and indifference to the rights of others. No clearer definition, applicable to the hundreds of varying circumstances that may arise, can be given. Under a given state of facts, whether negligence is culpable is a question of judgment. Ordinarily for the judgment of the jury, as is the question whether negligence exists at all. But in the one case as in the other it may become a question of law. If the negligence is so slight as not to reach the required standard the court should advise an acquittal of the accused. Under such circumstances the jury may not be allowed to find a verdict of guilty.' "

The defendant himself testified that he did not see the defendant; that he saw a man on the south side of the street start across, and that he applied his brakes; that the man he saw stayed at the south side, and the first he knew was when he heard his car strike something and he applied his brakes. This testimony rings true. What else could he have done under the circumstances? The fact that he did not remain at the scene of the accident can be justified by the other evidence in this case. His physical condition could have easily caused him to do

as he did, and especially his being frightened at the thought he had killed someone. Under the circumstances it was not unusual for him to have left.

The evidence of the state as to the actions of the defendant just before and after the accident is, we think, a strong circumstance to corroborate his evidence as to his physical condition at the time of the accident. If the state had shown that the defendant was under the influence of intoxicating liquor, or of some drug, or had been using the same, the facts and circumstances would have been corroboration of the state's case, but, as the facts existed, they were more favorable to the defendant. If the facts in this case justified a person in being held and tried for murder, and convicted of manslaughter, it would indeed be a peril for any person to accidentally strike and kill a person while driving an automobile. Certainly, stronger evidence than this should be presented by the state before a defendant should be permitted to have the issue presented to the jury charging him with murder.

At the close of the evidence defendant, among other requested instructions, asked that the jury be instructed that the evidence did not justify the court in submitting the issue of murder to the jury. This request was refused. Under the evidence as we view it, this request should have been granted. No element of murder was justified under the facts. We can easily see how the submission of this issue gave the jury an opportunity to compromise by finding defendant guilty of manslaughter in the second degree. However, we will say that, aside from refusing this one requested instruction, the instructions as a whole, as given by the court, were very fair to the defendant. The trouble here is that the jury refused to follow the

188

instructions as applied to the facts in this case, and notwithstanding the instructions, found the defendant guilty.

The fact that defendant testified that he has pleaded guilty to embezzlement in the courts of the state of Texas was no doubt of great force with the jury in finding defendant guilty.

From what we have stated, it will be seen that we are of the opinion the evidence in this case reveals that the killing of deceased by defendant was a pure accident, and while we recognize it is the well-settled law of this state that if there is evidence to support a conviction, the court will not weigh the sufficiency of the same to support it, yet it is, however, equally well-settled law in this state that this court will consider all the evidence to ascertain whether a verdict is in fact founded upon sufficient evidence to warrant a conviction.

If the evidence introduced by the state fails to incriminate the defendant, or as a matter of law is insufficient to show that the defendant is guilty of the offense charged, it is not only the right but the duty of the trial court to advise the jury to return a verdict of acquittal.

For the reasons above stated, we are of the opinion that the verdict of the jury in this case was contrary to the law and the evidence, and that the judgment of the district court of Bryan county is reversed, with directions to discharge the defendant.

DOYLE, P. J., and JONES, J., concur.